UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
            v.                    :
                                  :     Criminal No.  07-109 - RMC
E-GOLD LIMITED,                   :
GOLD & SILVER RESERVE, INC.,      :
DOUGLAS L. JACKSON,               :
BARRY K. DOWNEY and               :
REID A. JACKSON                   :
_____:


**DEFENDANT DOUGLAS L. JACKSON'S MEMORANDUM IN AID OF SENTENCING**

Joshua G. Berman (D.C. Bar # 489751)
Machalagh Carr (D.C. Bar # 501275)
Sonnenschein Nath & Rosenthal LLP
1301 K St N.W. Suite 600E
Washington, D.C. 20005
Telephone: (202) 408-5208
Facsimile:  (202) 408-6399

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PRELIMINARY STATEMENT ............................................................................1

I.     DR. JACKSON'S BACKGROUND ................................................... 2

    A.     Personal Background ................................................................. 2

    B.     Dr. Jackson's Full Education ..................................................... 2

    C.     Dr. Jackson and His Work as an Oncologist ............................. 4

       1.     His Years in the Army .................................................... 4

       2.     His Years in Private Practice .......................................... 7

       3.     Dr. Jackson's Good Works ........................................... 11

    D.     Dr. Jackson's Family ............................................................... 12

II.     GOLD AND SILVER RESERVE AND E-GOLD, LTD. ................... 14

    A.     Dr. Jackson's Vision and e-gold's Inception ........................... 14

    B.     e-gold's Flaws ......................................................................... 18

       1.     The Fight Against Online Financial Fraud ................... 19

       2.     Combating Child Pornography ..................................... 21

III.     A SENTENCE OF NO JAIL TIME IS APPROPRIATE IN THIS CASE ......... 25

    A.     Legal Framework for Sentencing Analysis under *Booker* and *Gall* ........ 25

    B.     Consideration of All §3553(a) Factors Supports a Sentence of No Jail Time ........................................................................... 25

       1.     Dr. Jackson's Advisory Guidelines Range ................... 26

       2.     The Presentence Investigation Report Incorrectly Calculates Dr. Jackson's Offense Level ........................................... 27

       3.     Dr. Jackson Provided Extraordinary Cooperation and Substantial Assistance to Law Enforcement Meriting a Departure Below the Guideline Range............................................................... 29

a.    Dr. Jackson's Investigative Assistance to State, Local, Federal and International Law Enforcement Warrants a Departure Under U.S.S.G. 5K1.1 and 5K2.0 ................. 29

i.    Investigations of Segvec and Maksik ................. 31

ii.    Investigation of Michigan Word Processing ........ 36

iii.    Investigation of Isle of Mann ............................. 37

iv.    Investigation of Van Dinh .................................... 38

v.    Investigation of "Girona Spain" .......................... 39

vi.    Investigation of Douglas Havard: ....................... 40

vii.    Assistance with Operation Mazhar ..................... 40

viii.    Investigation of Trevor Fing ............................... 42

ix.    Subpoena Response .............................................. 43

x.    Dr. Jackson Expected No Benefit For This Cooperation and the Government Has Conceded the Existence of Such Extensive Cooperation .......................................... 43

b.    Dr. Jackson's Relationship with Law Enforcement Renders his circumstances atypical and favors a departure under 5K2.0 .............................................................. 46

4.    The History and Characteristics of Dr. Jackson Support A Departure Below the Guidelines Range .................................... 50

5.    The Nature and Circumstances of the Offense Support A Departure Below the Guidelines Range ........................................ 51

a.    Dr. Jackson's Repeated Yet Unsuccessful Requests For Guidance From Law Enforcement Weigh Against Any Jail Sentence ....................................................................... 53

b.    The E-gold Vision In No Way Contemplated Criminality, and as such, Weighs In Favor of a Non-Jail Sentence ..... 55

C.    Dr. Jackson Will Best Serve Law Enforcement If Not Incarcerated ....... 56

D.    There is No risk of Recidivism, Thus Supporting A Non-Jail Sentence. ................................................................... 57

E.    A sentence of incarceration will destroy his family. ................................ 60

F.      The Appropriate Sentence for Dr. Jackson is Probation, With No
        Term of Incarceration  ............................................................................ 64

CONCLUSION  ............................................................................................................65

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*, 128 S.Ct. 586 (2007)............................................................25, 26

*Kimbrough v. United States*, 128 S.Ct. 558 (2007) .......................................................25

*United States v. Booker*, 543 U.S. 220 (2005) ........................................................25, 26

*United States v. Dethlefs*, 123 F.3d 39 (1st Cir. 1997) .................................................49

*United States v. Dyce*, 91 F.3d 1462 (D.C.Cir. 1996).................................................63

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) .............................................63

*United States v. Garcia*, 926 F.2d 125 (2d Cir. 1991) .................................................49

*United States v. Gauvin,* 173 F.3d 798 (10th Cir. 1999) .............................................63

*United States v. Greene,* 249 F. Supp. 2d 262 (S.D.N.Y. 2003).................................63

*United States v. Gottfried*, 58 F.3d 648 (D.C. Cir. 1995) ...........................................28

*United States v. Kaye*, 140 F.3d 86 (2d Cir. 1998) ............................................ *passim*

*United States v. Kelly*, 966 F.2d 1445 (4th Cir. 1992)...........................................31, 37

*United States v. Sclamo*, 993 F.2d 970 (1st Cir. 1993)................................................63

*United States v. Spiropoulos*, 976 F.2d 155 (3rd Cir. 1992).....................................31, 37

## RULES AND REGULATIONS

Fed. R. Crim. P. 35 ......................................................................................................57

31 C.F.R. § 103.125......................................................................................................58

45 C.F.R. Parts 160 & 164............................................................................................8

## STATUTES AND GUIDELINES

153 Cong. Rec. H13564, H 13580 (daily ed., Nov. 13, 2007)........................................................60

H.R. Rep. No. 110-140, pt II, at 2 (2007) ....................................................................................60

18 U.S.C. § 1956.....................................................................................................................26, 27

18 U.S.C. § 1956(h)......................................................................................................................26

18 U.S.C. § 1960...........................................................................................................................27

18 U.S.C. § 1960(b)(1)(A)-(C).....................................................................................................26

18 U.S.C. § 3553(a)................................................................................................................25, 26

18 U.S.C. § 3553(a)(2)..................................................................................................................25

18 U.S.C. § 3553(a)(5)..................................................................................................................25

18 U.S.C. § 3553(a)(6)..................................................................................................................25

18 U.S.C. § 3553(b)......................................................................................................................47

31 U.S.C. § 5318(a)......................................................................................................................58

The Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008)............................60

U.S.S.G. § 2S1.1...........................................................................................................................27

U.S.S.G. § 2S1.1(a)(2)..................................................................................................................26

U.S.S.G. § 3D1.1 ..........................................................................................................................27

U.S.S.G. § 5H1.6 ..........................................................................................................................63

U.S.S.G. § 5K1.1 ..................................................................................................................... passim

U.S.S.G. § 5K2.0 ..................................................................................................................... passim

U.S.S.G. §§ 5K2.0(a)(2)(B) ...................................................................................................46, 47

U.S.S.G. §§ 5K2.0(a)(2)(A),(B) ..................................................................................................46

U.S.S.G. § 5K2.0(3)......................................................................................................................47

**MISCELLANEOUS**

Peter J. Henning, *Prior Good Works in the Age of Reasonableness,* 20 Fed. Sent. R. 187 (2008) ..59

John S. Martin, Jr., *Let Judges Do Their Job*, N.Y. Times, at A31 (June 24, 2003)
(2003 WLNR 5657759) .......................................................................................................61

Ellen S. Podger, *Throwing Away the Key*, 116 Yale L.J. Pocket Part 279 (2007) ..........................59

U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal
Sentencing Guidelines*, at 6 (2004) .......................................................................................59

## INTRODUCTION

Dr. Douglas L. Jackson, by his undersigned counsel, respectfully submits this Memorandum to assist the Court in determining an appropriate sentence with respect to Dr. Jackson's conviction by a guilty plea to Counts One and Three in the Indictment, pursuant to the written plea agreement.  For the reasons set forth below, we respectfully submit that the appropriate sentence in this case is a non-incarceration sentence, due to the nature and circumstances of the underlying conduct, his extraordinary cooperation with law enforcement, his providing substantial assistance in the investigation and prosecution of others, his full acceptance of responsibility, and his lifetime of good works.  Specifically, this Memorandum provides information about Dr. Jackson's personal background and character, the criminal conduct, his efforts to cure and aid cancer victims, and his extensive cooperation with law enforcement in the fights against child pornography and online fraud.

## PRELIMINARY STATEMENT

Dr. Douglas Jackson has lived a life of service, compassion, integrity, and grace.  He has earned the respect and admiration of his colleagues, patients, fellow military officers, family and friends.  As the Court determines an appropriate sentence, we ask that the Court consider Dr. Jackson's lifetime commitment of helping others, the human lives whose condition he has bettered, his sixteen years of service to the United States, his service to his community and church, his extraordinary cooperation with government at great risk to himself, and his full acceptance of responsibility, not only for his acts but also for the failures of the companies that he conceived, built, and ran.

## I.      Dr. Jackson's Background

### A.      Personal Background

Dr. Jackson's upbringing was modest.  He was one of five children.  His father worked as an engineer and his mother stayed home to raise the family.  As a child, Dr. Jackson moved many times before graduating from high school.  Although these moves created uncertainty in his young life, he took strength from his parents; as such, over the years his family has remained close.

Dr. Jackson was exceptionally close to his parents and siblings growing up.  He remains close to his father and siblings to this day.  His parents raised him with a strong faith background, which remains important in his life.  His family was active in the Baptist church community; Dr. Jackson took that upbringing into his adult life.  Dr. Jackson, his wife and children over time gravitated towards the Presbyterian church, where they actively participated for many years.  He and Mrs. Jackson sang in the choir, as well as performing occasional solos and as a duet.  At various points, Dr. Jackson also taught Sunday school at the church.  At certain times, Dr. Jackson contributed 11% of his annual gross income to churches as a tithe.

Dr. Jackson and his family always placed a high value on education.  He understood at a young age that the best way for him to give back to the community was through attaining his education and helping others.

### B.      Dr. Jackson's Full Education

After high school, Dr. Jackson attended Penn State University in its pre-med program. He realized that he had a desire both to attend medical school and to serve in the Army.  Over the next sixteen years of his life, medical school and service in the Army both served as forces driving his dedication.  Because there was not a lot of money for his education, Dr. Jackson paid

his own way for his first two years of college by attending the local branch of Penn State, living at home with his family, and working as a carpenter to pay his tuition.

After his sophomore year, he switched to Penn State's main campus.  During that summer of 1976, Dr. Jackson enrolled in a competitive United States Army basic training summer program at Fort Knox in the hopes of getting a full ROTC scholarship.  Due to his outstanding performance, he received the scholarship; he spent his final two years of college focused on his studies and ROTC.  This ROTC service was the beginning of his sixteen-year career of Army service.  The following summer, 1977, Dr. Jackson attended the intense combat-leadership Ranger School and was awarded his "Ranger Tab."

Dr. Jackson worked hard in college, graduating from Penn State with a grade point average of approximately 3.7.  ROTC provided strong motivation and discipline and he excelled at both ROTC and his studies.  Due to his continued hard-work and dedication, he was accepted into several medical schools.  It was also during this time that Dr. Jackson met his wife, Mrs. Jackson.  With Mrs. Jackson supporting him, Dr. Jackson went to Medical School at Hershey Medical Center (part of the Penn State network) to receive his M.D.

Although medical school kept him busy, Dr. Jackson did not give up his church devotion and participation.  He faithfully attended Mountain View Bible Church.  His pastor at that time wrote to the Court that Dr. Jackson "showed at all times, a sincere faith in God.  His character was always obvious and pure."[1]

As part of his military scholarship obligations, Dr. Jackson spent each summer of medical school on active duty.  He spent his first summer at the Academy of Health Sciences in San Antonio, Texas focused on Military Medicine and Environmental Science.  The following summer, Dr. Jackson attended Advanced Officer Course at Fort Belvoir, Virginia.  The last two

---

[1] Exhibit 1 (Letter from Pastor N. Marks).

summers, Dr. Jackson participated in clinical rotations in General Surgery and Infectious Diseases.

After medical school, Dr. Jackson completed an internship in general surgery at Eisenhower Army Medical Center in Fort Gordon Georgia.  During this time, Dr. Jackson became interested in oncology and decided to devote his education to finding better ways to treat cancer in all forms, and to help those afflicted with this terrible disease.  He viewed radiation oncology as a means to help people during what may very well be the worst times in their lives. Inspired by this purpose, he then completed his residency in radiation oncology at the National Cancer Institute in Bethesda, Maryland, one of the top institutions in the United States.  Post-residency, in 1986, Dr. Jackson earned a coveted position as Chief of Radiation Oncology at Brooke Army Medical Center ("BAMC").  In many ways, this opportunity was Dr. Jackson's dream job.  It combined his belief in service to country with his goal of helping individuals afflicted with cancer.

### C.    Dr. Jackson and His Work as an Oncologist

#### 1.    His Years in the Army

Dr. Jackson served as Chief of Radiation Oncology at Brooke Army Medical Center between 1986 and 1992.  From the beginning of his professional career, Dr. Jackson felt strongly that while technical expertise was essential, it was equally as important to emphasize patient counseling and education.  Dr. Jackson believed in empowering his patients.  Given the myriad of pros and cons with different oncological treatments, and so many shades of gray with each decision that needed to be made by patients, Dr. Jackson felt strongly that his patients must be educated.  Dr. Jackson provided extensive education and counseling to each and every patient. He brought them up to speed so they could take control and make the best decisions for their own care.  As evidenced in some of the attached letters and notes, Dr. Jackson's patients

embraced this human-centric approach.  Especially in situations where the outcome of the cancer resulted in the end of the patients' life, Dr. Jackson made sure that his patients were prepared and equipped to deal with the decisions that needed to be made.

This approach was different from most clinical schedules.  This kind of education and counseling took an extraordinary amount of time with each patient.  The nurses, staff, and technicians both in the Army and later in private practice, never resented the different pace and were proud to be part of a team where the patients felt more empowered to deal with the situation at hand.

During his time at BAMC, Dr. Jackson earned the respect of his patients, colleagues, and staff for his extraordinary service.  This admiration is evident in the letters he received contemporaneous with those actions, as well as letters drafted to this Court to consider for sentencing.  Dr. Jackson not only treated his patients with the utmost care, but also earned the respect of his staff.  As one staff member, upon turning in her resignation, noted "It grieves me to leave your service for I have come to like and respect you and your work."  She continued, "Lastly, and I find this your most attractive characteristic, there has never been any doubt in my mind that your foremost concern is for the welfare of your patients.  This makes it all worthwhile."[2]  A former staff member who worked with Dr. Jackson during his time at BAMC described him as "a person of strong character, compassion, and morals."  In a letter that provides insight into the devotion of his patients, that same staff member described Dr. Jackson as a doctor who had the ability to make "patients feel very comfortable despite the terrifying process they were facing of being diagnosed with cancer and the treatment options they were being given."[3]

---

[2] Exhibit 2 (Letter from B. Olfers).
[3] Exhibit 3 (Letter from J. Massarello).

A former colleague of Dr. Jackson's who worked with him at BAMC wrote in a recent letter to this Court that Dr. Jackson was "one of the best radiation oncologists" with whom he had ever worked. He further explains, "by 'best' I mean not only professionally competent, but also a caring and compassionate human being who was deeply concerned about the terminally ill patients whose lives were entrusted to him."[4]

Dr. Jackson also sought to teach others how to better the lives of cancer victims, minimize their pain, and where possible, eradicate the cancer from the body. To this end, in 1990 Dr. Jackson accepted an unpaid appointed position at the University of Texas Health Science Center at San Antonio as an Assistant Professor of Radiology. Although he was not paid, he seized the opportunity to share his expertise with others. He sought to influence another generation of doctors who may have the opportunity to take the knowledge he knew to be so valuable and continue to serve patients and search for the best ways to conquer the disease.[5]

Dr. Jackson's unique compassionate and empowering approach can been seen in the way he was described by a former colleague recounting one particular professional interaction with Dr. Jackson. The Chief Clinical Physicist at BAMC commented on Dr. Jackson's treatment of a particularly difficult patient: "[Dr. Jackson] noted that radiation oncology staffs frequently see patients when they are very ill and difficult. He reminded us that those same patients were once at their personal best as productive and contributing members to society and loving members of their families. He suggested that we all needed to remember that fact."[6]

During the sixteen years that Dr. Jackson served in the United States Armed Forces, he received many awards and commendations. Among others, he received the Ranger Tab for successful completion of the highly competitive Army Ranger School; the Army Service Ribbon

---

[4] Exhibit 4 (Letter from Dr. Wiatrowski).
[5] See Exhibit 5 (Letter of Appointment).
[6] Exhibit 4.

for successful completion of officer candidate school; and the National Defense Service Medal for military service during periods of national emergency.[7]

### 2.        His Years in Private Practice

Dr. Jackson was honorably discharged from the Army in 1992 after sixteen years of service, including six years as a board-certified Attending Physician.  Holmes Regional Medical Center in Melbourne, Florida ("Holmes Regional") aggressively recruited Dr. Jackson to join its staff.  Dr. Jackson's mission there was a difficult one:  he was hired to rebuild Holmes Regional's radiation oncology program.  Indeed, Holmes Regional sought Dr. Jackson out in a national search to accomplish this goal.  The medical oncologist involved in selecting Dr. Jackson for this position noted that Dr. Jackson was Holmes Regional's "first choice for the position."[8]

As Medical Director of Holmes Regional, Dr. Jackson brought the same approach to patient care -- with a strong focus on patient education and counseling.  In his new position, he oversaw upgrading equipment, he improved the quality control program and helped the practice become more active in supporting multi-institutional clinical trials.  Under Dr. Jackson's guidance and leadership, Holmes Regional placed an increased focus on new technologies and practices.  Some of these new programs included incorporating stereo-tactic isotope implants for brain tumors (a technique for applying highly focused and concentrated levels of radiation to kill cancer cells in areas of the brain not amenable to traditional surgery), ramped-up interstitial implants (solid or encapsulated radiation sources, made in the form of seeds, wires, or other shapes, to be inserted directly into tissue that is to be irradiated) for prostate cancer, and intracavitary brachytherapy (a method for delivering very localized radiation to small tumors

---

[7] See Exhibit 6 (Certificate of Release of Discharge From Active Duty).
[8] Exhibit 7 (Letter from Dr. McClure).

which have not spread or to deliver additional dose of radiation to a small volume at high risk for recurrence) for obstructive bronchial tumors and gynecologic malignancies.

Each of these additions helped move this practice to the forefront of oncology practice. One former colleague mentioned this remarkable transition in a letter of support to this Court, noting that Dr. Jackson, "took an aging and somewhat stagnant program and transformed it quickly and expertly into a modern, thriving center that provided compassionate and cutting-edge care for our cancer patients."[9]  Another colleague (who Dr. Jackson recruited from out of state) joined Holmes Regional simply to have the opportunity to work with Dr. Jackson.  In her letter to the Court, she wrote:  "After hearing Doug Jackson's vision for Radiation Oncology at HRMC, I was motivated to leave New York in order to join his department in Florida."  She described the transition, "Over the course of a couple of years, under Dr. Jackson's leadership, the radiation oncology department was transformed into a world-class facility, providing world-class care in a warm and gracious environment."[10]

During his time in private practice, Dr. Jackson earned the admiration and respect of his colleagues and patients.[11]  As the sister of a former patient wrote of Dr. Jackson, "No matter what time of day or night we needed him - he was there for us.  My brother has beat it [cancer] again because of Dr. Jackson.  I can't say enough about this wonderful man."[12]

Like his Army patients, Dr. Jackson's private practice patients also embraced his approach.  Over the years, contemporaneous with his care, Dr. Jackson's patients wrote him

---

[9] Exhibit 8 (Letter from Dr. Badalato).

[10] Exhibit 9 (Letter from M.E. Masterson-McGary).

[11] Due to Dr. Jackson's specific request, privacy concerns and confidentiality provisions of 45 C.F.R. Parts 160 and 164 (the "Privacy and Security Rules") issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPPA"), we have omitted patient and family names.  Upon request, these records and names are available for the Court's in camera review.

[12] Exhibit 10 (Letter from Patient A).

numerous letters of appreciation and love.  To include them all would have been too voluminous.

Here are a small handful of excerpts:

- One patient wrote, "Thank you for your frank discussion, your kindness, and understanding, and for always giving of your time to listen."[13]

- The wife of another patient wrote that Dr. Jackson had "comforted me more than you know, and made it possible for me to deal with all situations by equipping me with the knowledge to do so."[14]

- In thanking Dr. Jackson for all of the time he took to explain her husband's condition, the wife of another patient wrote, "never did I get the impression that I was a bother to you.  You never conveyed annoyance or impatience and for that I am eternally grateful.  I wish you could know how comforting it was to talk to you and be enlightened when [other] doctors choose to keep me in the dark.  You are one in a million!"[15]

- Another patient wrote that "illness, cancer, and radiation are all new things to us. Your personal kindness took much of the fear away for us. We thank you so much."[16]

- A patient who knew Dr. Jackson because of his treatment and also his work for the American Cancer Society described  Dr. Jackson as "very caring and knowledgeable" and as someone who "took time to explain things medically in a way I could understand."[17]

- Another patient wrote, "after dealing with so many doctors this year, I've become quite an expert, and I can tell everyone that you are the best!  Please, always give to your patients what I received from you: your science, but also your warmth.  They'll love you as much as I do."[18]

Like his patients, Dr. Jackson's colleagues also were struck by his patient care, his

dedication to his work, and his commitment to helping others.  In preparation of this

Memorandum, we received a number of letters of support addressed to this Court, descriptive of

Dr. Jackson's efforts on behalf of his patients.  Here are excerpts of several:

---

[13] Exhibit 11 (Letter from Patient B).
[14] Exhibit 12 (Letter from Patient C).
[15] Exhibit 13 (Letter from Patient D).
[16] Exhibit 14 (Letter from Patient E).
[17] Exhibit 15 (Letter from R. Goode).
[18] Exhibit 16 (Letter from Patient F).

- One doctor who worked closely with Dr. Jackson during his time at Holmes Regional described Dr. Jackson as "an intelligent, well-educated, well-meaning and committed man" who had a "lifetime commitment to helping others, in particular others afflicted with desperate problems."[19]

- Another doctor, Dr. Yandel, who worked closely with Dr. Jackson for over 6 years described him as, "the most ethical and honest gentleman that I have ever worked with, specifically in regard to his forthright discussions to patients and family and fellow clinicians involved in the care of patients as to the adequacy and ethical nature of treatment" and explained "Dr. Jackson was second to none in regard to time spent with families and discussion of options and the optimal creation and maintenance of the best quality of life for our cancer patients."[20]

- Dr. Jackson's clinical physicist at Brooke Army Medical Center described him as a person who "always took the time, and extended the effort, to provide the best possible care to each of his patients . . . .  Dr. Jackson consistently demonstrated personal integrity and a firm commitment to a code of ethics that benefited his patients and his profession.  He certainly was very well respected by his colleagues as a person who always did the "right thing" because it was the "right thing" to do."[21]

- Dr. Jackson's medical physicist in private practice explained that Dr. Jackson was "a man of tremendous intellect" who had "achieved a true mastery of all aspects of Radiation Oncology . . . .  Doug would routinely invest a great deal of time talking with his patients and discussing treatment options with them.  If he felt there was a better treatment option offered at a different facility, Doug would always refer the patient to the other center without hesitation.  Doug worked extremely long hours, making sure that every patient was treated optimally.  During the treatment process (which lasts months) Doug always found time to answer every question or concern a patient or family member might have.  He never turned away indigent patients who needed treatment."[22]

- One doctor who participated in recruiting Dr. Jackson to work in Melbourne explained the desire to work with Dr. Jackson and commented, "his background, training, and references were clearly outstanding and he certainly exceeded all of our expectations.  His commitment to his patients and his level of compassion were unique for a radiation oncologist.  He not only took special interest in his patients during their treatment, but followed his patients from the initiation of their treatment to in many cases the end of their life.  He helped palliate patients with terminal cancer and was in every situation a caring, generous, and very giving physician.  He helped both patients and their families during what for many is the most difficult challenge

---

[19] Exhibit 7 (Letter from Dr. McClure).
[20] Exhibit 17 (Letter from Dr. Yandel).
[21] Exhibit 4 (Letter from Dr. Wiatrowski).
[22] Exhibit 9 (Letter from M.E. Masterson-McGary).

of their life."[23]

- Another former colleague who still interacts with many of Dr. Jackson's former patients wrote, "I still see some of the patients that Doug and I shared years ago who speak most kindly of him because of his devotion and caring approach to his work."[24]

Taken as a whole, Dr. Jackson's patients and colleagues paint a clear portrait of him as a physician and human being: dedicated, caring, committed, forthright and passionate. He sought to help, cure and ease the suffering of his patients and their families. This "first career" gives true insight into Dr. Jackson's character and should be considered as a strong mitigating factor when sentencing Dr. Jackson.

### 3.    Dr. Jackson's Good Works

Dr. Jackson's efforts on behalf of others extended far beyond the hospitals in which he worked. Dr. Jackson was an active member and supporter of the American Cancer Society ("ACS") for years. Dr. Jackson served on the South Brevard Board of Directors for the ACS and attended health fairs and educational programs to raise money for the programs supported by ACS. Dr. Jackson also contributed substantial personal time and personal funds to ACS' efforts both directly to ACS as well as through banquets, charity balls, and other fundraisers, including an annual 5K fundraiser event organized and underwritten by Dr. Jackson and his partner.

As part of his service to the Board of Directors, Dr. Jackson attended board meetings and fundraising events. Given his exemplary service, Dr. Jackson subsequently was nominated and served as the Board's Medical Advisor, an appointment considered a high honor in his field in recognition of his hard work and commitment to the cause. The opportunity to serve as the Medical Advisor to the South Brevard Board allowed Dr. Jackson to do what he loved best -- serve the society by being able to offer his medical expertise to help lay board members understand the terminology and risks of cancer. He excelled in this position and at the end of the

---

[23] Exhibit 18 (Letter from Dr. Deligdish).
[24] Exhibit 7 (Letter from Dr. Badalato).

term he was nominated to serve as President.  The former Executive Director of the Brevard

County Unit of the American Cancer Society, in her letter to the Court stated, "I counted on Dr.

Jackson on several occasions and he came through for me, and the American Cancer Society."[25]

A former patient noted that Dr. Jackson is an outstanding oncologist and someone who supported

the community through education and volunteerism.[26]

      As noted above, Dr. Jackson also immersed himself in his church and its activities.  In

many ways, he treated his fellow parishioners in the same way he treated his patients -- with

respect, compassion and attention.  Although he did not become a wealthy man through his years

of service as an Army doctor and a radiological oncologist, Dr. Jackson nonetheless committed

himself to helping those in his community who were less fortunate.

      In one instance Dr. Jackson gave a significant sum of money to a friend who had been

struck with a debilitating disease.  This contribution from Dr. Jackson allowed this family to

work through this difficult time.  Perhaps one of his fellow parishioners summed it all best in a

letter in 1995, after Dr. Jackson had made a significant financial gift to help that family get back

on its feet:  "It is difficult to express in words my gratitude for all that you have done for me and

my family."[27]

### D.     Dr. Jackson's Family

      As is noted above, Dr. Jackson met his wife while in college and they were married right

before Dr. Jackson enrolled in medical school. Both Dr. Jackson and Mrs. Jackson always

wanted children and a busy household full of love and laughter.  After about eleven years of

marriage and many difficult years of trying to have children, the Jacksons accepted that they

would not be able to have children the traditional way.  These eleven years were a difficult time

---

[25] Exhibit 19 (Letter from P. Goode).
[26] See Exhibit 16 (Letter from R. Goode).
[27] Exhibit 20.

for the young couple:  they went through endless fertility tests, surgical procedures and unsuccessful in vitro fertilizations.  While this situation would be trying for any couple, it brought the Jacksons closer together.  Mrs. Jackson noted in her letter to this Court that "During this whole period of about eleven years, Doug was very supportive emotionally and was next to me through the whole experience."[28]  Ultimately, they turned to adoption as an option.  A year later, their first son -- Ben -- arrived.  After moving to Florida, they adopted a second son -- Sam.

Without exception, Dr. Jackson is described by those who know him as an incredible father.  He is loving, compassionate, committed and engaged in their lives.  Dr. Jackson views Ben and Sam as blessings in his life.  He appreciates every day he spends with them.  He never takes for granted the joys that they bring.

Mrs. Jackson described Doug as "a wonderful father" who "gladly shared in the childcare tasks without complaining."[29]  Dr. Jackson has always been an involved father, helping the boys with science projects, and faithfully attending band concerts, soccer games, plays, and school parents' nights.[30]  Both of his boys took to music at a young age.  With Ben playing the clarinet and Sam playing the saxophone, Dr. Jackson was the proudest parent in the room on concert nights, beaming at his sons.  The Jackson family enjoys spending time outdoors together.  While the boys were young, Dr. Jackson often took them on canoeing adventures on the river near the family home in Florida.

The boys love spending this time with their father.  While Dr. Jackson's medical practice took up a significant amount of time, and the founding of e-gold even more so -- his boys nonetheless remained a priority.  Just this past year, Dr. Jackson and Sam completed a fabulous science project together -- they successfully designed and built a parabolic reflector solar cooker.

---

[28] Exhibit 21 (Letter from Mrs. Jackson).
[29] Id.
[30] Id.

In full disclosure, the project was only somewhat effective in cooking a hotdog. But, it was entirely effective in allowing Dr. Jackson and his son to bond, to work on a project together, and to focus on one another, blocking out all of the turmoil that has consumed their lives.

Dr. Jackson's family has always been there for him, too. When he lost his mother to metastatic breast cancer in 1999, it was the love and support of Mrs. Jackson and the boys that helped him through that painful time. Several years ago, the family survived a terrifying ordeal when Dr. Jackson contracted a rare and life-threatening bacterial infection destroying his heart valve. Mrs. Jackson truly believed Dr. Jackson was going to die. He had life-saving surgery, taking advantage of relatively new technology at Holmes Regional Medical Center. He spent nearly a month in the hospital including recovery time from the surgery. His wife and children were by his side throughout every stage of this ordeal.

## II.     Gold and Silver Reserve and e-gold, Ltd.

### A.     Dr. Jackson's Vision and e-gold's Inception

While Dr. Jackson was providing service to his community and guiding cancer patients through some of the most traumatic moments in their lives, he also sought to make an even greater impact in the global community, beyond the hospital setting. He also realized that while he was able to help his patients, he was regularly working 60-70 hours per week and wanted to spend more time with the family. In early 1995, several factors led to Dr. Jackson re-evaluating his life, and his life's work.

Dr. Jackson became increasingly interested in the evolution of this country's economic market -- and the impact this market had on the global economy. Dr. Jackson was struck by the fragility of the world's current economic models and their reliance on credit. (Sadly, Dr. Jackson's fears from the late 1990s came to fruition this past fall with the disastrous financial

collapse and the over-$700 billion bailout.)  He sought to develop a system more attuned to the emerging global economic needs, that fit within the Internet world.

Dr. Jackson realized that with the unprecedented emergence of secure low-cost global communications, computing power, and secure databases, all the building blocks were in place for individuals to be able to develop and offer privately-issued currency that substituted contract for discretion, and that eschewed the use of financial assets (bonds or other securities) as the underlying value.  He determined that a currency backed by gold, rather than backed by more volatile assets subject to the fluctuations of the political climate, would be a stronger and safer currency for the world's future.

In late 1995, Dr. Jackson began to offer liabilities backed by physical gold to be used as a form of money.[31]  At the time, e-gold was much smaller and the gold backing this original transfer of value actually being stored in a safe deposit box.  At the same time, Dr. Jackson began studying the work of leading economists.

In early 1996, Dr. Jackson contracted with Alex Soya of Logan Engineering to build a computer-based system and develop a client/server arrangement to bring e-gold into the broader marketplace.  Together with Soya, Dr. Jackson created a web-based application that could use any standard web browser as a client and any standard web server as a server.  Soya worked to develop front-end (customer-facing) web pages that would write customer instructions to the database.  Dr. Jackson worked to program back-end functions for automated processing.  This set-up was ideal to provide the broadest possible availability of e-gold to the broadest possible market.  This design made e-gold accessible to a wider audience and provided a permanent record of each and every transaction that occurred in this book-entry system.  As discussed

---

[31] As noted above, Dr. Jackson paid approximately 11% of his gross income to the church.  In 1995, this tithe (approximately $50,000 spread between several churches) was in the form of e-gold.

below, this design unfortunately did not deter criminals from using the system for fraudulent purposes.

Throughout this time, Dr. Jackson tried to continue his medical practice. He quickly realized, however, that time commitments required him to make a choice between his two professional passions. This decision was not an easy one for Dr. Jackson. Ultimately, he decided to pursue his vision of using e-gold to provide *universal* access to sound money and secure transactions.

The emergence of the commercial Internet had made it possible for the first time in history for a business (or even an individual) to offer goods and services to a global market. However, this innovation was shackled by the inadequacies of legacy payment systems. Specifically, existing mechanisms for receiving payment were subject to costly chargeback risks, and excluded the majority of potential customers on the planet, that is, people who lacked existing credit or might be unbanked altogether. Dr. Jackson understood that while credit cards worked for those who had access to them, credit cards were not sufficient for the broader global economy and in the many places where credit was not an option. He realized that the potential benefits of the modern global economy were denied to those subsisting within the limitations of a cash economy. Over time, Dr. Jackson built a service that mobilized the value of gold for Internet payments -- a payment system that was truly global to match the global capability of the Internet.

Of greater importance, Dr. Jackson was convinced that existing monetary arrangements were fundamentally flawed, tending to amplify credit cycles and the resultant real economy booms and busts. The deeper purpose he envisioned for e-gold was the macroeconomic stability that might result from a system that substituted contract for discretion and that affords end users direct access to settlement without the obligatory involvement of financial intermediaries.

e-gold was established in 1995 as a credible medium for Internet payment transactions, allowing safe, easy, and secure means to make account-to-account transfers of value on the Internet by anyone, anywhere in the world.  The target market for the system as Dr. Jackson envisioned it was people who use money, including those underserved by traditional financial and monetary arrangements.

Dr. Jackson saw that with the right system in place, an issuing bank in the Visa network could accept e-gold as an alternative to checks sent by mail, enabling immediate use of the value twenty-four hours a day, seven days a week, without the delays of mailing and manual processing, with no need for an error-prone human to open envelopes and re-enter handwritten data into a computer terminal, and no risk of bounced checks or other payment failure.  He pictured an entity such as Dell computer, accepting e-gold as an alternative to credit cards, opening up to a truly global market that no longer excluded the majority of people on the planet - people who lack credit cards or who live somewhere where the fraud risk is so high that Dell's credit card processor would reject the transaction automatically -- and increasing Dell's profitability since the fee for receiving an e-gold spend is less than one tenth of the fee paid to receive a credit card payment.

Dr. Jackson's vision had absolutely nothing to do with fraud or money laundering.  He did not seek to attract criminals or fraudsters.  He had no interest in skirting licensing requirements or laundering the money of wrongdoers.  Importantly, Dr. Jackson did not encourage untraceable anonymity on the e-gold system.  Rather, from the beginning, e-gold maintained a permanent record of every transfer that ever occurred.  It was this database that enabled and continues to allow Dr. Jackson to provide valuable information to law enforcement investigations.

Moreover, this was never a get-rich quick scheme for Dr. Jackson.[32]  He firmly believed

that the world would benefit from a currency based in precious metals -- which has lasting power

incomparable to any fiat legal tender.[33]  In fact, in order to finance this dream, Dr. Jackson left

the lucrative practice of medicine, sold the family home, liquidated his savings, stocks, money

purchase pension plans, his 401K plan and his and Mrs. Jackson's IRAs.  His personal equity

contributions to start e-gold between 1995 and 1998 amounted to approximately $750,000.00.

After exhausting every personal asset, Dr. Jackson resorted to borrowing more than $100,000.00

on credit cards to sustain e-gold through years of negligible revenue.  He has carried crippling

personal debt, foregoing repayment from the company in favor of leaving resources available for

urgent development tasks.  The personal and financial sacrifices were borne not only by Dr.

Jackson but also by his family.  Mrs. Jackson, like Doug, believed in this vision.

### B.  e-gold's Flaws

e-gold was like many other "start-ups" of the late 1990s.  It had a vision.  And, it had

flaws.  Better, though, than so many of the "dot-com" companies of this era, e-gold was not

precariously supported by ephemeral financial support.  Rather, e-gold's financial model was

grounded in real gold supplies and actual transactions.  e-gold's biggest flaw, however, was one

it shared with other online transactional entities such as "Hotmail," "PayPal," "Craigslist,"

"eBay" and other marketplaces -- it could be used not only by legitimate users, but also by

criminals.  Like public parks, well-known banks or Union Station in the non-virtual world,

online criminals saw e-gold as a place to do business.  The criminal element apparently viewed

---

[32] As noted above, Dr. Jackson did not intend to profit from the proceeds of crime.  This is
confirmed by the set up of the e-gold system where the average transaction fee is merely nine
cents and the largest possible fee for any payment transaction is about one dollar, in stark
contrast with other online payment methods.

[33] For an understanding of Dr. Jackson's intent when he launched e-gold, we have attached in his
own words, his vision of e-gold at the time.  See Exhibit 22.

e-gold, along with a number of other well known websites, as media through which to exchange illegal goods and services.

Dr. Jackson readily acknowledges that criminals used his site.  In fact, this abuse of his platform is one of his greatest regrets.  As he emphasized in a public statement posted on e-gold's website the day he pleaded guilty in this matter:

> e-gold's failure to emerge so far is a result of many factors but the root causes were design flaws in the account creation and provisioning logic that led to the unfortunate consequence of vulnerability to criminal abuse.  Criminal abuse of the e-gold system, in turn, led to a self-reinforcing negative reputation.[34]

He is not proud of this development.  However, what cannot be disputed is that Dr. Jackson actively sought to work with law enforcement to combat the criminality on e-gold. While Dr. Jackson did not go far enough in these compliance efforts, he routinely and repeatedly cooperated with law enforcement for years to fight this criminal element.

### 1.     The Fight Against Online Financial Fraud

When Dr. Jackson became aware of possible criminal activity by e-gold users, he mobilized effective countermeasures to combat the problem.  Such countermeasures always involved using the e-gold database and online information to trace the illegal transactions and relationships between e-gold users.  He also used the various exchange providers to trace the location of the fraudsters.

Because of the unique programming supporting the e-gold payment system, there is a permanent record of each and every historical system transaction.  If a transaction or account raised concerns of criminality (i.e. the amount of a particular transaction, or a specific request from law enforcement), Dr. Jackson could research and review account transactions. Additionally, through the database and his investigative capabilities, Dr. Jackson could trace each transaction.  He also could track the value in the accounts as they moved from one account

---

[34] Exhibit 23 (July 21, 2008 post by Dr. Jackson "A New Beginning").

to another.  Moreover, he was able to link to an identifiable unique Internet Protocol address ("IP"), and then in turn to a physical location of a user.

Through this combination of a permanent transaction record, the ability to trace the user's physical location, and information obtained through the exchange providers, law enforcement was able to pinpoint within a small geographic radius where the target of an investigation accesses the Internet and sends packages, and which identification was used to open accounts. Moreover, in circumstances where it was determined that criminals were using the e-gold system, Dr. Jackson developed the capability to freeze accounts from further transactions and to block accounts from accepting any additional value of e-gold.

As is true with all companies, the ability to combat problems improved over time.  While there has always been a permanent record of all transactions, Dr. Jackson's ability to use the database to fight crime evolved as his knowledge of law enforcement strategies developed.  For example, in December 2005, e-gold obtained more powerful processors for its database server to enable searching of memo fields, a function that e-gold did not previously have.  These more powerful searching capabilities enhanced e-gold's ability to detect e-gold account holders buying or selling stolen credit card numbers, people engaged in wire fraud, and criminals buying or selling child pornography.  The technology also allowed for a greater ability to interdict and stop those transactions.

Law enforcement, working closely with Dr. Jackson, used this technology in a number of law enforcement investigations.  Although a number of examples are described in detail below. See infra Section III(B)(3), one is worth noting here.  On March 27, 2006, following extensive discussions to establish a protocol for continuous interaction to pursue buyers and sellers of stolen credit card information known as "carders," Inspector Greg Crabb with the U.S. Postal Inspection Service supplied Dr. Jackson with a list of top targets for investigation.  That same

day, after 15 hours of investigative effort, Dr. Jackson provided preliminary data regarding the

identified targets, but also included information on what appears at first glance to be two

criminals, "Napalm" and "Lord Kaisersose."  Also that same day, Dr. Jackson reached out with

an inquiry to an e-gold exchanger in France and received conclusive data establishing the

identity, location, and even elements of the criminal record of one Ali Beldjouheur of Marseilles,

aka "Lord Kaiersose, aka "Napalm" and provided this information to U.S. Postal Inspector

Crabb.[35]  It is Dr. Jackson's understanding (from Inspector Crabb) that this information proved

incredibly valuable in his efforts to investigate the crime ring.  This example alone demonstrates

Dr. Jackson's good faith efforts to use the system to combat crime.

## 2.    __Combating Child Pornography__

Perhaps the single online criminal element that truly turned Dr. Jackson's stomach the

most was child pornography.  Partially routed in his deep love for his children, the church, and

helping others, Dr. Jackson vigorously attacked the problem of child pornographers using e-

gold.[36]  In writing to this Court, Mrs. Jackson noted that "Doug is a vehement opponent of online

fraud, child pornography and exploitation.  He has spent much of his life wishing for children

and then seeking to protect them.  Over and over he participated in far-flung conferences aimed

at eliminating child exploitation."[37]  And, like his approach to financial crime, he determined that

the best way to combat online child pornography transactions was to shut down the sellers.

---

[35] See e.g., Exhibit 24 (Mar. 27, 2006 e-mail from D. Jackson to G. Crabb responding to a
request for information); Exhibit 25 (Mar. 27, 2006 e-mail to D. Jackson from Patrick at Any
Gold Now exchange service with name, address, cell phone number, and photocopy of
identifying information requested); Exhibit 26 (Mar. 28, 2006 e-mail from D. Jackson to G.
Crabb sending identifying information on "Lord Kaisersose" including name, address, criminal
record).

[36] It is worth noting that Dr. Jackson refused to enter into any plea that attached any culpability
to child pornography sales that occurred over the e-gold system.  Understanding this, the
government did not require it as part of his plea. See Plea Agreement of July 18, 2008.

[37] Exhibit 21.

Again, this view differed from the prevailing view of law enforcement at the time -- targeting the buyers only.  Dr. Jackson was one of the original warriors in this arena.

In Spring 2004, Dr. Jackson saw a newspaper article stating that child pornographers used alternative payment systems.  The article named PayPal and e-gold. Dr. Jackson immediately sought out the senior United Kingdom law enforcement official quoted in the article and traveled to meet with him to provide assistance in the investigation and prosecution of the offenders.  It was also at this time that Dr. Jackson fully engaged with the National Center for Missing and Exploited Children ("NCMEC").

In Summer 2005, Dr. Jackson's long-standing efforts to combat child pornography were rewarded.  He was invited to participate in the NCMEC's newly formed Financial Coalition to Combat Child Pornography.  NCMEC selected Dr. Jackson because he was widely regarded as one of the world's leaders in the crusade against child pornography online, and because e-gold was one of the first six companies to join in this commitment and work with the President and CEO of NCMEC to develop the concept of the coalition.  In the press release announcing the newly formed coalition, NCMEC stated:

> Eighteen of the world's most prominent financial institutions and Internet industry leaders have joined with the National Center for Missing & Exploited Children ("NCMEC") and its sister organization, the International Centre for Missing & Exploited Children ("ICMEC") in the fight against Internet child pornography. The goal is to eradicate commercial child pornography by 2008.[38]

Needless to say, Dr. Jackson was proud to have been asked to join this group of 18. (Indeed, Dr. Jackson had been seeking collaboration with NCMEC since mid-2004 when he first learned of their existence and activities in this area.)  Dr. Jackson firmly believed that by working with the NCMEC Coalition, he would find answers to his questions of how best to rid e-

---

[38] Exhibit 27 (press release found at http://www.missingkids.com/missingkids/servlet/ NewsEventServlet?LanguageCountry=en_US&PageID=2314 and Oct. 17, 2005 welcoming letter from President and CEO of NCMEC, Ernie Allen).

gold of the criminal element.  Ernie Allen, the President and CEO of NCMEC and ICMEC, speaking of Dr. Jackson and several others, stated at the Coalition's formation that "to eliminate the commercial viability of child pornography, we must stop of the flow of money.  To do that, we need the involvement of the world's leaders in the payments industry and the Internet.  The founding members of the Financial Coalition Against Child Pornography are to be commended for joining this critical fight."  Id.[39]

Dr. Jackson viewed the NCMEC Coalition as an ideal place to coordinate *with* law enforcement in this effort.  As such, that is precisely what he did.  Immediately after his first visit to NCMEC in August 2005, he coordinated a protocol for exchange of intelligence to facilitate preparation of subpoenas.  He instructed the Director of NCMEC's Exploited Child Unit to distribute e-gold's contact and service of process information to over 200 law enforcement agencies.[40]  He spent several years partnering with domestic and international law enforcement agents to fight the transmission of online child pornography.  Moreover, Dr. Jackson worked extensively with the NCMEC CyberTipline to coordinate information and to help as an investigator.  Indeed, in an e-mail to Dr. Jackson praising his work with the CyberTipline and asking for more assistance, John Shehan, the CyberTipline Program Manager stated, "Thus far you and your company have been nothing but accommodating and have yet to say "no" to any requests presented.  For that I am grateful and can give you nothing but praise."  In asking for

---

[39] These facts clearly undermine any suggestion that Dr. Jackson is a Johnny-come-lately to the war against child pornography.  He never would have been invited to participate in NCMEC if he did not already have a long track record.  His strong efforts *prior* to 2005 were the key to his inclusion in this important international working group.

[40] See Exhibit 28 (correspondence between D. Jackson and J. Shehan including Aug. 30, 2005 e-mail describing sample language and procedures for obtaining e-gold records).

more assistance, Shehan noted,  "You have an excellent opportunity to stay on top and to continue being a leader in this coalition."[41]

Because of his extensive work with law enforcement, Dr. Jackson participated in and spoke at numerous conferences.  He was invited to participate in a conference entitled "Protecting Children Online" in Belfast, Ireland in November 2005.  Dr. Jackson also attended an Interpol cyber-crime conference in Lyon, France in February 2006 at the invitation of Inspector Gregory Crabb of the United States Postal Inspection Service.  Dr. Jackson was invited to address this group, and presented on the traceability of e-gold transactions.  In April 2006, Dr. Jackson was invited to participate in another conference devoted to combating Internet crime, the Cyber Crime Conference in Moscow, Russia.  There he presented to the group.  During this same trip, Dr. Jackson accompanied Inspector Crabb to the Russian Interior Ministry.  During this meeting, Dr. Jackson participated in discussions leading to a protocol facilitating rapid informal passage of intelligence between the United States and Russian law enforcement using e-gold and Webmoney investigators as a conduit.  He also spoke before the Senate Banking Subcommittee at a hearing in September 2006 regarding on-line purchasing of child pornography and ways in which the financial industry could be doing a better job to fight to eradicate the availability of child pornography.  Dr. Jackson spoke as a founding member of NCMEC and provided significant information to the committee on Internet payment systems and ways in which the financial coalition could strive to eradicate online child pornography.

---

[41] Exhibit 28 (correspondence between D. Jackson and J. Shehan including Aug. 23, 2006 e-mail from J. Shehan of NCMEC to D. Jackson praising his work and asking for more assistance).

### III.     A SENTENCE OF NO JAIL TIME IS APPROPRIATE IN THIS CASE

#### A.     Legal Framework for Sentencing Analysis under *Booker* and *Gall*

Recent Supreme Court case law makes it clear that sentencing courts are to consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a).  Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Booker, 543 U.S. 220 (2005).  These factors include:  the nature and circumstances of the offense and the history and characteristics of the defendant; id. 18 U.S.C. § 3553(a); the need for the sentence imposed to satisfy each of the various goals of sentencing including promoting respect for the law, reflecting the seriousness of the offense, affording adequate deterrence to criminal conduct, protecting the public from further crimes of the defendant, and providing the defendant with needed training; id. § 3553(a)(2); any pertinent policy statement; id. § 3553(a)(5); and the need to provide restitution to the victims. Id. § 3553(a)(6).  The Supreme Court in Kimbrough explained that Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." 128 S.Ct. at 570.  Indeed, based on its evaluation of all of the §3553(a) factors, the Court may elect to impose a non-Guidelines sentence -- including a sentence substantially deviating from the advisory Guidelines range -- "based solely on policy consideration, including disagreements with the Guidelines." Kimbrough, 128 S.Ct. at 570.

#### B.     Consideration of All § 3553(a) Factors Supports a Sentence of No Jail Time

The totality of the § 3553 factors overwhelmingly supports a sentence of no jail time.  A non-incarceration sentence will be sufficient to accomplish all of the traditional goals of sentencing.  First, in the plea agreement, the government explicitly left open the availability of a sentence of no jail time.  As detailed below, Dr. Jackson's life-saving background, his unique

25

and extraordinary cooperation with law enforcement over the better part of a decade, his commitment to church and community, the crippling impact of a jail sentence on his children and family, and other factors, all demonstrate that a sentence without incarceration not only is entirely appropriate, but also is most consistent with the facts and circumstances here. Moreover, and importantly, no societal interest weighs in favor of incarcerating Dr. Jackson and destroying his family.

## 1.    Dr. Jackson's Advisory Guidelines Range

Although a defendant's sentencing range under the United States Sentencing Guidelines is no longer binding, or even presumptively reasonable, Gall, 128 S.Ct. at 596-97, the sentencing Court is to apply the factors set forth in 18 U.S.C. § 3553(a). Booker, 543 U.S. at 220. While courts still must take into account the relevant Guidelines calculations as part of reaching an appropriate sentence, Gall 128 S.Ct. at 596, the advisory Guidelines are only one of the factors to be considered in imposing sentence. Id. at 602. Dr. Jackson recognizes that the Court is free to make its own independent determination of the Guidelines range. However, given the nature of the criminal conduct and what the government could actually prove in Court, the government and Dr. Jackson agreed to a stipulated Guidelines Range in the written plea agreement.

Here, Dr. Jackson pleaded guilty to violations of 18 U.S.C. § 1956(h) (Conspiracy to Engage in Money Laundering), and 18 U.S.C. § 1960 (b)(1)(A)-(C) (Operation of an Unlicensed Money Transmitting Business). The base offense level is found in U.S.S.G. §2S1.1(a)(2), which provides for a base offense level of eight. Although it charged a number of other transactions in the indictments, the government identified specific provable transactions that related to Dr. Jackson at the time of the plea agreement. The government expressly did not link Dr. Jackson to other transactions. Because the value of laundered money is more than $10,000, with conviction under 18 U.S.C. § 1956, the base offense level is 12. There is a two point enhancement for a

conviction under 18 U.S.C. § 1956 and also a two point enhancement because Dr. Jackson was the organizer or leader.

Pursuant to U.S.S.G. § 2.S1.1,  the 18 U.S.C. § 1960 offense provides for an offense level of 14, with a value of laundered funds calculated at more than $30,000, and a two point enhancement for Dr. Jackson being the organizer or leader, resulting in an offense level of 16. Additionally, the government has indicated that Dr. Jackson's guilty plea warrants a three-point reduction for acceptance of responsibility.  Dr. Jackson and the government both agree that the offenses of money laundering and operation of an unlicensed money transmitting group under U.S.S.G. § 3D1.1, resulting in a total offense level of 13.  At offense level 13, with a Criminal History Category of I, Dr. Jackson's guidelines range is twelve to eighteen (12-18) months.  The government also explicitly agreed not to seek a term of imprisonment of more than 14 months.

## 2.    The Presentence Investigation Report Incorrectly Calculates Dr. Jackson's Offense Level

Dr. Jackson pleaded guilty on July 21, 2008 pursuant to a written plea agreement.  The plea agreement, drafted by the government attorneys, provides that for the money laundering offense, the value of laundered funds is more than $10,000, and for the operating a money transmitting business, the value of laundered funds is more than $30,000.  See Plea Agreement at 2-3.  The government and Dr. Jackson also agreed that the Statement of Offense -- written by the government, accepted and signed by Dr. Jackson, and filed with the Court -- outlined activities consistent with the plea agreement.

Despite the factual agreement of the parties, the Probation Office based its Guidelines calculations on a loss amount significantly higher than even that which the government believed was attributable to Dr. Jackson.  The Probation Office in the Presentence Investigation Report ("PSR") included amounts allegedly related to unproven charges in the indictment.  Specifically, the Probation Office claimed, without any support, that the amount of loss was estimated to be

$1,911,379.07.  Probation then used this number to add an unsupported six-level increase to the their guidelines calculation.  Dr. Jackson objected to this calculation.  Perhaps of greater import, the government also objected.  In its October 29, 2008 "Comments to Presentence Investigation Report" of Dr. Jackson, the government recognized that Dr. Jackson was being held responsible for a particular fraudulent investment scheme where specific evidence existed demonstrating that Dr. Jackson had knowledge of the fraud.  The government further explained, "*Dr. Jackson, personally, is only liable for one set [of approximately $30,000] of investment fraud transactions*."  Id. (emphasis added).  The government, undoubtedly in the best position to evaluate the evidence and proof, rejected the notion that Dr. Jackson was responsible for greater sums of money, and concluded that Dr. Jackson should be held personally responsible only for transactions laid out in detail in the Plea Agreement and corresponding Statement of Offense.

Dr. Jackson urges this Court to reject the Probation Office's unsupported calculations.  They are supported by absolutely no evidence in the record.  To be included in the Guidelines calculations, "relevant conduct" at a minimum must be proven by a preponderance of the evidence.  See United States v. Gottfried, 58 F.3d 648, 652 (D.C.Cir. 1995).  The government bears the burden of proof.  Id.  Here, there is no such proof.  Indeed, to the contrary, the government has made clear that it does not believe such a calculation is appropriate.

Additionally, the Probation Office has taken the indefensible position that Dr. Jackson was personally involved in transactions related to child exploitation and child pornography.[42] The PSR oddly asserts that as a result of his involvement in offenses related to child exploitation, a six level enhancement should be added for "Specific Offense Characteristic."  These allegations are unsupported by the record.  Moreover, the government did not conclude that such

---

[42] Perhaps, like Dr. Jackson, the probation officer is offended by anything having to do with these despicable topics.  But that is no reason to include them in a Pre-Sentence Investigation Report or to use them to enhance a sentence.

conduct was attributable to Dr. Jackson.  As such, he was not required to plead guilty to any

offenses related to the exploitation of children.  Additionally, the lack of any connection between

Dr. Jackson and child pornography became clear at the plea colloquy.  During Dr. Jackson's

allocution, this issue was addressed directly:

> **Court**:  And then on numerous occasions you and your co-defendants and others
> had reason to know that certain amounts, certain accounts on the e-gold system
> were being used for criminal purposes but allowed transactions from those
> accounts to continue.  As well as knowing that e-gold was being used for such
> criminal activity as wire fraud and investment scams and transactions for child
> pornography.  Do you understand that those are also parts of the facts of the
> statement behind the offense?
>
> **Mr. Berman:**  Your Honor, as distinguished from the corporate pleas, this
> statement of offense does not identify child exploitation or child pornography as
> one of the criminal offenses.  It's on the bottom of page 7, it's limited to wire fraud
> and investment scams as the articulated examples.
>
> **Court**:  Then I retract my reference to child pornography and reference only wire
> fraud and other criminal conduct that's referenced in the statement of offense.

(Transcript p 50 line 4-20).  The Court should reject the Probation Office's unsupported findings

and calculate the offense level based on the conduct that Dr. Jackson, the government, and this

Court, agreed was relevant.  The appropriate offense level, prior to § 3553 departures, is 13.

> **3.**    **Dr. Jackson Provided Extraordinary Cooperation and
> Substantial Assistance to Law Enforcement Meriting a
> Departure Below the Guidelines Range**

> **a.**    **Dr. Jackson's Investigative Assistance to State, Local,
> Federal and International Law Enforcement Warrants
> a Departure Under U.S.S.G. 5K1.1 and 5K2.0**

Dr. Jackson has, by any reasonable definition, "provided substantial assistance in the

investigation or prosecution of another person who has committed an offense." U.S.S.G. §

5K1.1.  Dr. Jackson recognizes that the right to move for such a 5K1 departure lies exclusively in

the hands of the government, and that such a 5K1 letter was not explicitly contemplated in the

plea agreement.  As a matter of fact and law, however, given that Dr. Jackson's conduct has met

this standard, his extraordinary cooperation should be taken into account in giving him a sentence of no jail time.[43]  Moreover, due the sheer number of cases in which Dr. Jackson has provided substantial investigative resources, and due to the truly global reach of his investigative assistance, a factor not contemplated by the Commission, a departure is also warranted under section 5K2.0.

The following are a number of examples where Dr. Jackson has provided substantial assistance in the investigation and prosecution of criminals.  In these cases, he has worked closely and directly with various law enforcement agencies throughout the United States and world-wide to thwart criminal conduct related to ponzi-schemes, credit card fraud, child pornography and cyber-terrorism.[44]  The examples described below rely on actual e-mails between Dr. Jackson, law enforcement and others.  Importantly, this cooperation spanned the periods before and during the government's investigation and prosecution of Dr. Jackson.  Even after being indicted and prior to entering the plea of guilty, with absolutely no representations of leniency or guarantees by the government, Dr. Jackson continued to zealously cooperate. Because the significant investigative help provided to law enforcement was not required as part of any plea negotiation or agreement, nor provided with the intention of garnering a sentencing benefit in any way, and because of the truly global span of the assistance Dr. Jackson has

---

[43]  Dr. Jackson concedes that the Plea Agreement did not contemplate the government making a §5K1.1 motion.  He does not contend that the government has breached the agreement in this way.  Rather, he believes that due to his exceptional, voluntary, and significant involvement helping law enforcement investigate on-line criminal offenses, the government should make a 5K departure motion on Dr. Jackson's behalf.  There is absolutely nothing in the language of the Guidelines or existing case law which requires a formal "cooperation agreement" as a predicate for such a motion.  When compared with the wide variety of situations in which the government makes such a motion, Dr. Jackson's case is a compelling one for such a motion.

[44] A full description and accounting of each and every one of these instances would have taken literally hundreds of pages of briefing.  We concluded that such a briefing would have been overkill and redundant.  As such, we selected merely 8 of over 50 examples of Dr. Jackson's unique and compelling cooperation with the government.

provided to law enforcement around the world, his cooperation warrants a significant departure below offense level 13.[45]

### i.  Investigations of Segvec and Maksik

In January 2006, the operator of a software company, Eric Sites of Sunbelt Software, alerted e-gold technical staff about a newly detected malware device that was targeting e-gold users.  From the outset, it was clear that the operation of the device was a violation of federal criminal law.  Sites indicated that he believed the malware was being circulated by a criminal ring calling itself "ratsystems."  Immediately, Dr. Jackson used e-gold's new processors to search for "ratsystems" in the in the "memo" field of accounts.  In doing so, Dr. Jackson uncovered a trove of information demonstrating the existence of a suspected criminal ring that appeared to be buying and selling credit card information.  Taking advantage of the fact that e-gold's permanent records allowed tracking of relationships between accounts, Dr. Jackson

---

[45] In many cases, Dr. Jackson is unaware of the ultimate result of the government's investigations.  While Dr. Jackson certainly provided substantial assistance, he had no power to force the government to prosecute.  In some cases, it appears that the agents simply let cases lapse, whether due to lack of resources, lack of will or other reasons.  In other cases, prosecutors did not pursue the wrongdoing.  On other occasions, the government successfully prosecuted the wrongdoers, but did not inform Dr. Jackson of the resolution.  However, government decisions not to prosecute certainly do not undermine the real and substantial assistance Dr. Jackson provided.  Moreover, the courts are clear that substantial assistance does not require an ultimate prosecution of another.  See United States v. Spiropoulos, 976 F.2d 155 (3d Cir. 1992) (cooperation need not result in a prosecution or conviction to justify a large downward departure. and assistance to an investigation may be sufficient in and of itself); United States v. Kelly, 966 F.2d 1445 (4th Cir. 1992) (A successful prosecution of others is not necessary under the standard for substantial assistance set out in the guidelines) (unpublished decision).
However, in several instances Dr. Jackson was able to determine the outcome, either because law enforcement specifically informed Dr. Jackson that the information that Dr. Jackson personally provided to law enforcement resulted in the arrest and prosecution of the offender.  See e.g., Exhibit 46 (letter to D. Jackson from Shaun McLeary thanking him for his assistance and informing him that targets of the investigation pleaded guilty and requesting to use the information Dr. Jackson provided to assist with confiscation proceedings); or through a Department of Justice Press Release detailing the indictments of persons he investigated and identified to law enforcement, See e.g., Exhibit 40 (press release identifying Maksym Yastremskiy and Albert Gonzales as "Maksik" and "Segvec").

pursued the leads and discovered evidence of an international network apparently engaged in "carder" activities.

Armed with this information, Dr. Jackson promptly reached out to international law enforcement agents, United States Secret Service, and members of the NCMEC Financial Coalition.  He ultimately reached U.S. Postal Inspector Gregory Crabb, who arranged for Dr. Jackson to meet him and his supervisor Buddy Lane at the Lyon Interpol Cconference.[46]  Upon return, Dr. Jackson traveled to Inspector Crabb's office in Arlington, Virginia for further coordination.  Dr. Jackson provided extensive and detailed information to Inspector Crabb.

Between January 2006 and November 2006, Dr. Jackson devoted over 500 hours to providing substantial assistance to the law enforcement team headed by Inspector Crabb.  Dr. Jackson followed Inspector Crabb's explicit instructions and operated, in many ways, as an extension of the international law enforcement investigation.  This assistance was not in response to any subpoena or compulsory law enforcement tool; rather, it was a genuine effort to combat the illegal and improper use of e-gold's platform.  At Inspector Crabb's request, the e-gold accounts associated with the criminal activity were neither blocked nor frozen so that the activity could continue to be traced.[47]

---

[46] See e.g., Exhibit 29 (Jan. 24, 2006 e-mail from D. Jackson to W. Peterson of United States Secret Service asking for assistance and providing subpoena information); Exhibit 30 (Jan. 27, 2006 e-mail from D. Jackson to W. Peterson asking for investigative help and guidance on how to proceed); Exhibit 31 (Feb. 4, 2006 e-mail from D. Jackson to C. Gerding at Citigroup providing information and asking for help); Exhibit 32 (Feb. 6, 2006 e-mail from D. Jackson to A. Landt at Visa providing the information gathered and asking for help); Exhibit 33 (Feb. 8, 2006 e-mail from R. Ziolkowski at Citigroup, to G. Crabb at USPIS, R. Villanueca at USSS, and D. Larkin at FBI forwarding D. Jackson's request for help).

[47] Under other circumstances, Dr. Jackson would have immediately blocked or frozen the suspect accounts.  However, in these instances, he complied with the explicit law enforcement requests to leave them open in order to trace and catch the real criminals.  During this time period, Dr. Jackson repeatedly reminded Inspector Crabb and law enforcement that there was significant value in these accounts.  See e.g., Exhibit 37 (Feb. 23, 2006 e-mail from D. Jackson to G. Crabb asking for a subpoena or an estimate of time as to when to expect a subpoena and Feb. 25, 2006 response from G. Crabb to D. Jackson).

Throughout this collaborative investigation, the pattern of cooperation and assistance repeated itself over and over again.  Inspector Crabb (or one of his colleagues, William Schambura) identified an investigative target based on information provided by Dr. Jackson.  Dr. Jackson conducted an extensive forensic investigation, analyzing the network of accounts controlled and used by the target, and all accounts that received value from any target account. In cases where targets had directly or indirectly interacted with an exchange service, Dr. Jackson reached out directly to the exchange service and obtained additional information to identify and locate the targets.  In literally dozens of instances, Dr. Jackson promptly provided the information and details to Crabb, Schambura and their law enforcement teams.  A small sampling of their correspondence follows:

- Thank you for bringing this organization to our attention.  I believe that I am familiar with the activities of some of the individuals you are suggesting. . . . The law enforcement investigators that I am bringing together in Lyon would greatly benefit from your information concerning the flow of funds.[48]

- Thank you for taking the time to examine this activity with us in this iterative fashion.  I have a small list of e-gold accounts that trace to individuals that are tied to these credit card organizations.  This will be a place to start. (followed by a list of accounts).[49]

- Doug, in examining Maksik's account, I am trying to figure out how where [sic] he is moving all of the money and with whom.  I need the identifiers for the counter accounts that are below.  Where is he taking out all of the money? Does It go into a WebMoney purse?[50]

- Doug, can you provide us transaction details and counterparty details of the following egold number: 2464856? Maksik, whom we've known is one of the largest data sellers on the Internet, as of recently we were able to possibly link him to one of our largest Reshipping cases.[51]

- Doug, this information on Segvec is outstanding.  Do you mind sharing your contact at CardOne with me?  I think that we can definitely get the legal

---

[48] Exhibit 34 (Feb. 9, 2006 e-mail from G. Crabb to D. Jackson).
[49] Exhibit 35 (Mar. 27, 2006 e-mail from G. Crabb to D. Jackson).
[50] Exhibit 36 (Mar. 30, 2006 e-mail from G. Crabb to D. Jackson).
[51] Exhibit 38 (Apr. 7, 2006 e-mail from W. Schambura to D. Jackson).

> process in place to go after Segvec and other related account info.  I don't want the account to be suspended, if we can monitor it, then we can get a physical body behind the ATM withdrawals.  Could you refresh my memory on how we have established that Segvec and Stephen Ceres are one in the same?[52]

Each of the above emails was followed by significant, verifiable and accurate information provided by Dr. Jackson.

Although Dr. Jackson provided assistance to Inspector Crabb in literally dozens of cases, the "Segvec" and related "Maksik" investigations are worth further elaboration here.  During his analysis and investigative efforts, Dr. Jackson identified a particular account that contained and processed substantial value.  An individual with the user name "Segvec" controlled this account.  Dr. Jackson spent over 100 hours working on the Segvec (and related Maksik) investigations.  The results were of great significance to U.S. law enforcement.  This investigation ultimately led to the arrest and 27-count indictment of an 11-person carder ring, which is still considered to be one of the largest credit card fraud rings ever prosecuted.[53]  Again, by any definition, Dr. Jackson clearly provided substantial assistance in the investigation and prosecution of others here.

Needless to say, law enforcement agencies were thrilled by the results and Dr. Jackson's assistance.  They continued to work with Dr. Jackson, and indeed, encouraged him to participate in international conferences in Poland, in Washington D.C., and at Interpol.[54]  Below are snippets from a small selection of some of the correspondence between Dr. Jackson and the law enforcement agents at the time, demonstrating some of his efforts and their deep appreciation:

---

[52] Exhibit 39 (May 7, 2006 e-mail from G. Crabb to D. Jackson).

[53] See Exhibit 40 (U.S. Department of Justice Press Release).

[54] See Exhibit 41 (Feb. 9, 2006 e-mail from Crabb to D. Jackson providing information about a conference at Interpol, "I am certain that we could use e-gold's assistance in support of this meeting.  The law enforcement/private industry meeting is going to be held at Interpol in Lyon, France. . . if you are able to attend, the International community would be very grateful.  Additionally, if you would be willing to provide a presentation at the event, the international community would be grateful to learn how to obtain records from e-gold).

- Thank you for taking the time to examine this activity with us in this iterative fashion. I have a small list of e-gold accounts that trace to individuals that are tied to these credit card organizations. This will be a place for us to start. . . . As we begin to examine the activity of these individuals, I expect that we will begin to find some striking patterns. Bill and I have accumulated over ten thousand e-mail addresses of subjects that are engaged these credit card fraud activities. It may be useful for us to provide you with these e-mail addresses to assist in our examination of this activity. I will call you after my meeting this afternoon.[55]

- First pass - I'm saving these as Excel 4 worksheets since I figure whatever version Excel you are working with should be able to open. I could also do csv (or you could convert) - let me know which is most expedient. . . . Zo0mer leads right to Maksik, but both bring up this 2464856 (hardware?) guy I was mentioning last week who particularly irks me . . . . I called him Stephen Ceres but I think segvec is probably a better nym [sic].[56]

- This is an expansion of previous file titled Stephen Ceres. This combines several segvec accounts. He used a debit card issued by 385775 but I'm unfamiliar with then and have held off on asking them for the card data until I have a sense of whether they are/were OK.[57]

- I heard back quickly from Shamrock, the Dublin domiciled, offshore privacy service. He is traveling and did not have full access to data. Plus, they are currently transitioning to tighter AML rules (promulgated by CardOne of Canada), some of which go into effect 5/12 but have in the past deleted data after 90 days. That being said, he believe the bank that actually does the debit cards in question, Royal Bank of Montreal, may have the full data set. What he did have was a few e-mail addresses [followed by a list of information provided].[58]

- Thank you for that e-mail earlier concerning Valenzuela and Carranza. Extremely interesting. Also, of other note, there is a connection between Valenzuela, Carranza, and one of the counterparties known as Nicole Hixson. . . . From what we have been noticing, Carranza has been directing "carders" to Valenzuela, but the money laundering is going on through Valenzuela and going back eventually to Carranza.[59]

---

[55] Exhibit 35 (Mar. 27, 2006 e-mail to D. Jackson from G. Crabb).
[56] Exhibit 42 (Mar. 27, 2006 e-mail from D. Jackson to G. Crabb during investigation responding to Exhibit 35).
[57] Exhibit 43 (Apr. 10, 2006 e-mail from D. Jackson to G. Crabb).
[58] Exhibit 44 (May 3, 2006 e-mail from D. Jackson to G. Crabb).
[59] Exhibit 45 (May 3, 2006 e-mail from W. Schambura to D. Jackson).

- Excellent work on the Postal Money Orders.  We cannot thank you enough for that lead.  We will certainly run that information through our money order coordinator at USPIS.[60]

- This is good stuff. . . If that phone number is correct, or was in the past, this will be the break in the case we have been waiting for, for quite a long time concerning him.[61]

This collaborative investigative effort yet again demonstrates the tremendous cooperation Dr. Jackson provided law enforcement throughout the years.  These are not instances where the company was merely responding to government subpoenas as required by law.  The e-mail exchanges highlighted here -- as well as the dozens attached to the previous examples -- make clear that law enforcement routinely called on Dr. Jackson to provide informal assistance.  They treated him like a peer.  As a result, he provided significantly valuable information to them.  Importantly, much of this cooperation was done at a time when even acknowledging that criminal activity was taking place within the e-gold system was a great risk to Dr. Jackson.  He and his companies were being investigated for being complicit in much of the criminal activity taking place throughout the Internet and Dr. Jackson had received no immunity for information provided to law enforcement.

### ii.    Investigation of Michigan Word Processing

In November 1999, many years before the government investigation began, the U.S. Postal Inspection Service (in Detroit, Michigan) contacted Dr. Jackson and G&SR for assistance in the investigation and prosecution of a stolen check ring.  The investigation related to a number of stolen and forged checks that had been sent to G&SR for funding InExchange orders.  G&SR was able to stabilize the value, and enable the bank on which the checks were drawn to recover the full value.  In response to a request for voluntary assistance from the government (with no

---

[60] Id.
[61] Exhibit 43 (Apr. 10, 2006 e-mail from W. Schambura to D. Jackson responding to information received).

subpoena), Dr. Jackson provided immediate helpful information in identifying the suspect.  Like many other investigations, the requests were informal in nature, without a compulsory component.  Consistent with his practice, Dr. Jackson took time, resources, and energy to respond to the requests quickly, including working with a bank to verify account numbers.[62]

### iii.      Investigation of Isle of Mann

In March 2000, Barclays Bank in the United Kingdom contacted G&SR about ongoing financial fraud.  Specifically, the bank indicated that two bank wires totaling $15,000.00 had been diverted from a depositor's accounts.  Dr. Jackson immediately investigated the incident. He ran computer analysis, scoured the records, and provided data for identifying and locating the perpetrator.[63]  In October 2000, two investigators from the Isle of Mann Financial Crimes United met in person with Dr. Jackson at the offices of G&SR.  Dr. Jackson walked the law enforcement agents through the e-gold and G&SR processes in great detail, giving them insight into their investigative capabilities.  Dr. Jackson also carefully reviewed the process by which he would assist them in gathering data for purposes of formally prosecuting the suspect.  It appears clear that it was Dr. Jackson's assistance which led directly to the identification of the suspects. Moreover, it is clear that Dr. Jackson undertook this cooperation without any compulsion and prior to receiving a formal request (e.g., subpoena).  Rather, he did so because of his firm core belief in using e-gold to thwart criminality, not reward it.  Moreover, it serves to underscore that

---

[62] See e.g., Exhibit 47 (Nov. 19, 1999 e-mail from D. Bosch, United States Postal Inspector, requesting information about account names, related e-mail addresses, IP addresses and photocopies of any information that Dr. Jackson could help with; Exhibit 48 (Dec. 7, 1999 letter to Comerica Bank Investigative Services from Barry Downey.

[63] As a formal matter, on behalf of G&SR, defendant Barry Downey requested a formal subpoena for privacy and confidentiality reasons, which G&SR received in September 2000.

Dr. Jackson and e-gold and G&SR were always willing to educate law enforcement and teach them how to best utilize and leverage his platforms.[64]

### iv.      Investigation of Van Dinh

On January 19, 2001, Omnipay received a series of OutExchange orders that appeared to be structured to evade OmniPay's daily per-customer transaction limit, a limit Dr. Jackson had established to help combat fraud.  As was customary, the transaction was frozen and the e-gold was held pending an investigation.  Subsequently, it was put into escrow.  Investigations coordinated and overseen by Dr. Jackson, and conducted alongside e-gold's in-house investigators, revealed evidence of identity theft and hijacking of several e-gold accounts through malware and phishing exploits.  Dr. Jackson identified Van Dinh, a student at Drexel University, as the perpetrator.

Dr. Jackson did not sit on this information or ignore it.  To the contrary, he promptly contacted several law enforcement agents at both the SEC and FBI.[65]  Dr. Jackson actively pushed law enforcement to pursue this activity and charge Van Dinh.  Unfortunately, law enforcement elected not to prosecute at that time.  However, it was clear that Dr. Jackson alerted the SEC and FBI to the threats Van Dinh posed.  In 2003, the SEC brought civil charges against Van Dinh for an unrelated hacking activity.  It appears that it was Dr. Jackson who first put Van Dinh on the SEC's radar screen.  Dr. Jackson's conduct here squarely falls within the category of providing substantial assistance in the investigation and prosecution of others.

---

[64] See e.g., Exhibit 49 (May 17, 2006 e-mail from D. Jackson to S. McLeary providing sample language and procedures for serving process to obtain e-gold records).

[65] See e.g.,  Exhibit 50 (Jan. 24, 2001 e-mail from D. Jackson to J. Thomas at the SEC providing information related to wire notifications, identifying information, corresponding account information for "Van Dinh"); Exhibit 51 (Apr. 20, 2001 e-mail from B. Downey to L. Jensen at the FBI attaching a word document summarizing internal investigation of Van Dinh and known victims); Exhibit 52 (Copy of complaint in SEC v. Van T. Dinh 03-cv-11964-RWZ).

### v.   **Investigation of "Girona Spain"**

In April 2001, e-gold investigators detected fraudulent activity.  Dr. Jackson again

promptly sought assistance from law enforcement authorities.  Here, an e-gold user fraudulently

collected e-gold passwords by spamming e-gold customers with an e-mail message purporting to

be from e-gold, Ltd. and then directing the customers to a fake e-gold website at "e-qold.com."

The purpose of the scheme was clear:  hack into valid e-gold accounts and take value from these

accounts.  Dr. Jackson and Barry Downey requested the assistance of two agents at the United

States Secret Service, Brian Lambert[66] and Eric Gomez.[67]  They also sought assistance from

Special Agent Lori Jensen with the F.B.I. to prosecute the criminals.[68]  Over five years later, in

May 2006, law enforcement apparently still had not taken action and the investigations lingered.

At that time Dr. Jackson reached out to Postal Inspectors Crabb and Schambura to provide them

with information and to ask for help.[69]

Indeed, Dr. Jackson and others at e-gold pushed federal investigators for over seven years

to prosecute the hacking and identity theft associated with this individual.  Concurrently, e-gold

exchangers in Europe, also victimized by the same criminal, sought the engagement of Interpol

and marshalled extensive date regarding his exploits.  In March 2008, in the midst of the

government's current prosecution of Dr. Jackson (and prior to the plea), Inspector Crabb

contacted Dr. Jackson with an urgent request for assistance in tracking this same criminal.  Dr.

Jackson immediately mobilized his investigative and technical staff and provided another wave

of extensive data, culminating in real-time tracking of the criminal's Internet access, to law

---

[66] See Exhibit 53 (May, 1, 2001 e-mail to Brian Lambert at United States Secret Service).
[67] See Exhibit 54 (May 15, 2001 e-mail to Eric Gomez at United States Secret Service).
[68] See Exhibit 55 (Apr. 13, 2001 e-mail to Special Agent Lori Jensen with the FBI).
[69] See Exhibit 56 (May 1, 2006 e-mail to U.S. Postal Inspectors Gregory Crabb and William Schambura).

enforcement agents.[70]  This federal criminal investigation is ongoing and Dr. Jackson stands

prepared to continue his substantial assistance on this matter.  This case again demonstrates Dr.

Jackson's commitment to assisting law enforcement.  Where many others would have refused to

cooperate when facing indictment, Dr. Jackson instead aggressively sought to assist in the

investigation and prosecution of real criminals.

### vi.   Investigation of Douglas Havard

In January 2005, Dr. Jackson received a call from a detective with the United Kingdom's

National Crime Squad inquiring about an American criminal (residing in the UK) involved in the

theft and sale of credit card and identification information.  Dr. Jackson immediately provided

substantial intelligence to the UK National Crime Squad and gave advice on how best to fast-

track additional information requests, formal and informal.  In response to this cooperation, the

lead agent, Detective Martin D. Cook, wrote:  "I am most grateful for the confidential

intelligence that you have supplied to me on this occasion, at your own free will."[71]

### vii.   Assistance with Operation Mazhar

Beginning in May 2006 and continuing through August 2007 -- after the government

brought its indictment -- Dr. Jackson provided informal voluntary assistance to Officer Shaun

McLeary of the United Kingdom's National Terrorist Financial Investigation Unit ("NTFIU") in

an investigation of alleged United Kingdom-based "cyber terrorists."  This collaborative law

enforcement effort was codenamed "Operation Mazher."  As part of his efforts to assist the

investigative efforts, the NTFIU officer, accompanied by an agent of the F.B.I., spent two full

days with Dr. Jackson interactively searching valuable information available in the e-gold

---

[70] See Exhibit 57 (series of Mar. 27 through May 13, 2008 e-mails, each with significant identification data sent to Gregory Crabb and William Schambura).

[71] Exhibit 58 (Jan. 11, 2005 e-mail from Detective Cook to D. Jackson).

database.  Dr. Jackson ran numerous queries in the e-gold database and shared significant

information with the agents.

The information that Dr. Jackson provided included detailed identification information, e-

mail addresses of potential suspects, current IP addresses for the computers used by the potential

suspects, and in several instances actual physical addresses of the suspects.  E-mail

correspondence attached as Exhibits 46, 49, 58 and 59 demonstrates the significant

communications between the agent and Dr. Jackson regarding suspected cyber-terrorists, several

requests for information and expressions of gratitude for the information provided.  Indeed, Dr.

Jackson's efforts led directly to the successful prosecution of several defendants.  Because Dr.

Jackson is not a member of law enforcement and almost all of his cooperation was informal and

voluntary, in only a few instances is Dr. Jackson aware of the outcome.  However, several of the

matters in which Dr. Jackson provided substantial information did end in the successful

prosecution of the target.

Law enforcement again greatly appreciated these collaborative efforts.  One NTFIU

officer remarked "Thank you very much for all of your recent assistance.  It has proved to be

very useful and has generated a lot of new leads for us."[72]

In addition to the e-mail correspondence, there is a letter from the agent with NTFIU

explaining the outcome of the trial of the defendants found as a result of "Operation Mazhar" and

asking for Dr. Jackson's permission to use the information gathered to assist them further in

confiscation proceedings.[73]  In the Counter Terrorism Bulletin in 2007, NTFIU highlighted

Operation Mazhar as a successful conviction of terrorists and described:

> In July 2007, three men were jailed for a total of 24 years for incitement to
> murder after they encouraged other over the Internet to commit acts of terrorism.
> They used e-mail and administered Internet char-rooms to encourage people to

---

[72] Exhibit 59 (June 24, 2006 e-mail from Shaun McLeary to D. Jackson).
[73] Exhibit 46.

follow the ideology of Osama Bin Laden and distribute violent extremist material such as beheadings and terrorists atrocities. They were the first people ever to be convicted of incitement to murder using the Internet in the UK.[74]

Dr. Jackson's substantial assistance -- leading directly to convictions -- in the Mazhar investigation again demonstrates his efforts on behalf of law enforcement. These efforts even extended beyond the U.S. borders and assisted international efforts.

### viii.   Investigation of Trevor Fing

In October 2006, Col Fry, the Coordinator of Operations and Intelligence of the Australian High Tech Crimes Center ("AHTCC"), requested Dr. Jackson's assistance in tracking a suspected criminal by the name of "Trevor Fing." Coordinator Fry did not serve Dr. Jackson or e-gold with a subpoena; rather, he made an informal request. The AHTCC agent also sought Dr. Jackson's help in locating Fing's assets. Fry contacted Dr. Jackson because of Dr. Jackson's reputation in the international community for providing assistance in the investigation and, as necessary, prosecution of online criminals. Specifically, the Chief of the AHTCC (Kevin Zuccato) met Dr. Jackson at the "Protecting Children Online" conference in Belfast in November 2005 and expressly recommended Dr. Jackson.[75] On the very same day, with no delay at all, Dr. Jackson immediately offered his assistance and his willingness to provide data including e-mail addresses, IP addresses and home addresses.[76] Later that same day, Dr. Jackson provided a full history of all transactions related to the person in question.[77] Dr. Jackson identified several accounts controlled by the target of the investigation and obtained further data from an e-gold

---

[74] Exhibit 60 (2007 NTFIU Counter Terrorism Bulletin).

[75] See Exhibit 61 (Col Fry wrote to Dr. Jackson, "I refer to your meeting with our Kevin Zuccato at the Belfast "Protecting Children Online" conference in November 2005 and I am writing in the hope that you are able to assist an Australian law enforcement agency with the attached request for information").

[76] See Exhibit 62 (Oct. 24, 2006 e-mail to Col Fry from Douglas Jackson telling Col Fry "we're on it" and "I've got requests out to the exchange services").

[77] See Exhibit 63 (Oct. 24, 2006 e-mail to Col Fry from D. Jackson containing IP stands pairs and transaction history of account in question.

exchange provider and from a corporate services company in Panama that accepted e-gold payments.  Dr. Jackson also supplied the Australian law enforcement authorities with tracking data and details of a bank account in Sidney, Australia controlled by the target.  E-mail correspondence and letters attached as Exhibit 61 further demonstrate the voluntary nature of Dr. Jackson's cooperation and of the help he provided.

**ix.**   **Subpoena Response**

The eight examples above all were instances of voluntary cooperation, with no compulsory process nor legal obligation.  In addition to those and numerous other instances of voluntary cooperation, Dr. Jackson and e-gold also fully complied with the legal subpoenas they regularly received from law enforcement.  E-gold publicly displayed the location for service of process on its website.  Upon receipt of such a request, e-gold promptly responded with as much information as possible.  Dr. Jackson expressly instructed outside counsel responsible for receiving notices of subpoenas to forward such requests immediately to Dr. Jackson to ensure a timely response.  Given his strong belief in assisting law enforcement, Dr. Jackson demanded this swift compliance from outside legal counsel.  Over the course of the past eight years, e-gold has responded to literally hundreds of subpoena requests from law enforcement.  Although these requests were time consuming and expensive, Dr. Jackson embraced each request.  While this kind of cooperation is expected of companies, it serves to further highlight that Dr. Jackson routinely acted in compliance with the law and with the intent to help law enforcement at all times.

**x.**    **Dr. Jackson Expected No Benefit for this Cooperation and the Government has Conceded the Existence of Such Extensive Cooperation**

The above eight examples are merely that -- samples of the extraordinary cooperation that Dr. Jackson routinely and repeatedly provided to law enforcement over the better part of a

decade.[78]  Each example represents dozens of hours of work.  In each investigation, Dr. Jackson

partnered with law enforcement agents.  In many cases, the assistance led directly to the arrest

and prosecution of criminals.  We are hard pressed to identify another criminal defendant -- in

reported or unreported cases -- who provided this kind of substantial assistance before

indictment, during the pendency of the criminal case and indeed, as discussed below, after

resolution of the matter.

      It is also worth noting that Dr. Jackson undertook these cooperative efforts with

absolutely no intention of reaping any benefits.  Unlike the vast majority of "cooperating

witnesses," he did not cooperate to obtain a sentencing benefit.  He did not act out of self-

interest.  He did not seek financial rewards, like many "confidential informants."  Rather, in the

same way he spent his first career helping and saving lives, Dr. Jackson did so because he

believed it was the right thing to do.  This extraordinary help provided to law enforcement was

just that -- help.  Dr. Jackson never wanted e-gold to be used by criminals.  When Dr. Jackson

left a thriving medical practice to devote himself full time to developing these companies, it was

not so that the criminal underworld of the Internet would use his creation to profit.  In every

instance where Dr. Jackson had an opportunity to help law enforcement he has done so.

      Finally, this Court can look to the government's own statements in this case to appreciate

the deep and substantial assistance provided by Dr. Jackson.  First, on May 2, 2006, in a letter

sent to prior counsel in this case, the lead prosecutor, Assistant U.S. Attorney Laurel Loomis

Rimon acknowledged that Dr. Jackson had ongoing contact with agents from the United States

---

[78]  These examples are only a small sampling of the numerous instances of Dr. Jackson's
cooperation.  Other examples include the participation in the investigation of the criminal credit
card fraudsters known as:  z00mer, Darker, Notepad, Track, Smash, cc-trader, cvvseller, Cesar
Carranza, the Atlanta Drop Alliance, Blinky, c00ler, denisabi, Jilsi (mentioned briefly above),
Hixson, Pudu, Raghu, Akhitobe, DelusionFX, Valenzuela and Carranza (mentioned briefly
above) and many others.  For the sake of brevity, we have not included detailed descriptions of
each of these matters nor attached relevant e-mails and correspondence.  Of course, if the Court
wishes to hear additional details or review such documentation, we will provide it immediately.

Postal Inspection Service (among other law enforcement agencies).  The letter reminded counsel

that the prosecution has "not agreed to any limitation or conditions on how information that Dr.

Jackson might provide to law enforcement would be used.  An awareness of the criminal activity

of third-party users (or customers) of a money transmitting business may impact the liability of

the business or related individuals/entities."  Ms. Rimon further stated:

> [w]hile ***Dr. Jackson's cooperation is appreciated***, we want to be clear that, to
> date, we have extended no offer of immunity (of any sort) for any information he
> may provide.  Any information provided by Dr. Jackson to law enforcement
> agents can be used against him.  Regardless of whether be continues to provide
> some information voluntarily, we expect G&SR will comply with any legal
> process served upon it."[79]

In this correspondence, AUSA Rimon makes clear that Dr. Jackson's cooperation was

completely voluntary and without any expectation of coinciding benefit.

AUSA Rimon sent law enforcement agents from the United States Postal Inspection

Service (who were working on the above-mentioned Maksik and Segvec matters) a copy of the

letter with an instruction not to contact Dr. Jackson for a period of five days.  It appears that she

made this instruction in an effort to give Dr. Jackson time to consider whether he wanted to

continue cooperating even though the government, with her at the helm, was poised to indict him

and that he would get nothing from the government in return.  Needless to say, the law

enforcement agents needed Dr. Jackson's assistance.  In an e-mail correspondence to Dr.

Jackson, Inspector Crabb alerted Dr. Jackson to this contact and requested that when Dr. Jackson

and his attorneys had evaluated the letter and were ready to continue to engage in exchanges (of

information), that Dr. Jackson should contact them.[80]  Notwithstanding this potential leverage,

Dr. Jackson never hesitated.  He provided an incessant stream of valuable information in this and

other cases that led directly to prosecutions and convictions.

---

[79] Exhibit 64 (emphasis added).
[80] Exhibit 65 (July 9, 2006 e-mail from Inspector Crabb to D. Jackson).

Second, the government again concedes Dr. Jackson's substantial assistance in a letter from government attorney Kimberly Kiefer Peretti dated April 7, 2008.  In this letter, Ms. Peretti outlines several more instances where Dr. Jackson in his individual capacity was helpful and cooperative with law enforcement and where Dr. Jackson, as the founder of e-gold, directed his employees to ferret out criminals and keep the e-gold system as safe as possible from criminal abuse.  The letter is attached as Exhibit 66 and notes that current and former employees discussed with the government that Dr. Jackson helped train the employees to investigate complaints of criminal activity, and established programs to block and freeze accounts as soon as he learned of certain criminal activity going on.  Moreover, this letter includes valuable information that Shaun McLeary of the New Scotland Yard in the United Kingdom, William A Schambura and Gregory S. Crabb of the United States Postal Inspection Service, and Ernie Allen of the National Center for Missing and Exploited Children all found Dr. Jackson to be helpful and cooperative in responding providing information related to investigations and leads.[81]

### b.   Dr. Jackson's Relationship with Law Enforcement Renders his circumstances atypical and favors a departure under 5K2.0

Dr. Jackson's longstanding interactive relationship with law enforcement, combined with the thousands of hours of help that Dr. Jackson has volunteered to root out wrongdoers, independent and unrelated to his own investigation and prosecution, places Dr. Jackson in a situation not adequately contemplated by the Commission in promulgating the guidelines.  As such, a departure is warranted under section 5K2.0.

U.S.S.G. §§ 5K2.0(a)(2)(A)-(B) recognize that circumstances may exist which were not adequately taken into account by the Guidelines in determining the applicable guideline range.  Section 5K2.0(a)(2)(A) expressly states, "If any such circumstance is present in the case and has

---

[81] See Exhibit 66 at 4.

not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) . . . may be warranted."  Likewise, U.S.S.G. § 5K2.0(a)(2)(B) makes clear that "[a] departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."  See also, U.S.S.G. § 5K2.0(3).

Dr. Jackson's significant contribution to local, state, federal and international law enforcement, falls squarely within section 5K2.0.  The Guidelines do not contemplate the situation where the defendant has provided substantial assistance to authorities not within the control of the federal prosecutors assigned to the case.  In United States v. Kaye, the Court noted that the term "offense" in § 5K1.1 is properly interpreted to refer only to federal offenses and that Section 5K1.1 addresses assistance only to federal authorities.  140 F.3d 86, 87 (2d Cir. 1998).  While Dr. Jackson has provided substantial assistance to federal authorities to help investigate and prosecute federal offenses, and his assistance would warrant a government motion under section 5K1, Dr. Jackson's assistance is not limited to these instances.  Indeed, Dr. Jackson has also provided substantial assistance to state and local authorities, as well as international authorities not contemplated by the Guidelines.  The Court in Kaye held that the district court had the power to consider whether to give a downward departure under section 5K2.0 based on the defendant's substantial assistance to state and local authorities.  Id. at 89. The Court explained that while the Assistant United States Attorney "may be in a better position than the sentencing court to evaluate the defendant's cooperation with the federal investigative agencies . . . this may not be the case where the defendant's cooperation is with state and local authorities.  Id. at 88.

Where, as here, (and as explained in detail above), the defendant's substantial cooperation is with international law enforcement in tracking truly global crime, the federal prosecutors may not be in the best position to evaluate the assistance provided by the defendant. Assistance on a global scale to the New Scotland Yard in the United Kingdom, the United Kingdom's National Terrorist Financial Investigation Unit, The Australian High Tech Crimes Center, the Isle of Mann Financial Crimes Unit, and the United Kingdom's National Crime Squad is clearly not contemplated by the language of section 5K1.  Just as assistance to state and local law enforcement has been held to not have been contemplated by the Commission, clearly this type of collaborative, international assistance was likewise not contemplated by section 5K1.1.  Dr. Jackson urges this Court to consider a departure under section 5K2 for substantial assistance not contemplated by the Commission.

It is indisputable that Dr. Jackson's cooperation has been extensive, voluntary, robust, and successful.  He assisted literally hundreds of investigations.  His assistance led directly to dozens of prosecutions and convictions.  He provided this assistance throughout e-gold's inception and growth, the government's investigation into e-gold activity, the subsequent prosecution and guilty plea in this case.  Indeed, this cooperation continues to this very day.  Even at a time when the prosecutors in this very case reminded Dr. Jackson that he had been offered no protection for the information that he provided, and understanding that acknowledging that criminals were using the system he created would only serve to create more problems for him and his companies, Dr. Jackson thought it was more important to help root out the criminals and help law enforcement in any way possible than to protect his own interests by remaining silent.

In light of the fact that the government has elected not to make a section 5K1.1 motion, the Court should nonetheless determine that the information provided to law enforcement over

the course of the last eight years is significant enough to warrant a departure under section 5K2.0.  In drafting section 5K1.1, the commission likely did not envision the interactive, peer-like relationship that Dr. Jackson had with many facets of law enforcement.  Dr. Jackson's devotion of literally thousands of hours over the last eight years, only a small sampling of which are explained here, are mitigating factors that are not adequately considered by the guidelines, and therefore the Court may *sua sponte* depart downwards.  See United States v. Garcia, 926 F.2d 125, 127-28 (2d Cir. 1991) (downward departure from sentence recommended under the sentencing guidelines was proper based on defendant's facilitation of proper administration of justice).  Indeed, the "cooperation" anticipated by section 5K1.1 is more in line with a criminal defendant being coerced into helping with the investigation of his co-defendants with promises of leniency.  "Section 5K1 depends on a defendant's 'assistant to the authorities,' a phrase which, in context, mean assistance *to the prosecution*."  United States v. Dethlefs, 123 F.3d 39, 45 (1st Cir. 1997).

The assistance Dr. Jackson provided (and will continue to provide) has been assistance to authorities, but not only *federal authorities* as was anticipated by the guidelines. Kaye, 140 F.3d at 86, 87.  Indeed, many different agencies benefited from Dr. Jackson's cooperative efforts.  The government cannot now contend that it has not been *assistance to the prosecution* for it has been assistance to many prosecutions.  The assistance that Dr. Jackson has provided has been assistance to the United States Postal Inspection Service, the United States Securities and Exchange Commission, the Federal Bureau of Investigation, the United States Secret Service, the New Scotland Yard in the United Kingdom, United Kingdom's National Terrorist Financial Investigation Unit, The Australian High Tech Crimes Center, Isle of Mann Financial Crimes Unit, United Kingdom's National Crime Squad, The National Center for Missing and Exploited Children.

The commission did not contemplate such assistance on a truly global scale, Dr. Jackson's assistance is not the assistance that the federal prosecutors are in the best position to evaluate -- this assistance, related to global crimes and assisting law enforcement internationally is more in line the assistance to state and local authorities in that the federal prosecutors are removed from the investigation -- and as such the Court has the discretion to consider a departure under section 5K2.0.  "5K1.1's requirement that federal prosecutors make a motion for the departure is so ill-suited to situation in which the defendant's assistance was given to non-federal authorities that some explicit expression of the Commissions' intent in that regard would have been expected."  <u>Kaye</u>, 140 F.3d at 88.

Here, the prosecutors are simply not in a position to evaluate the assistance given to international law enforcement and as such, this is a proper place for the Court to consider a departure under 5K2.0.  Dr. Jackson's cooperation and investigative assistance is in many ways beyond the situation contemplated by 5K1.1 and his extraordinary efforts in this regard warrant a sentence of no jail time.

**4.      <u>The History and Characteristics of Dr. Jackson Support A Departure Below the Guidelines Range</u>[82]**

As set forth in details above, <u>see</u> <u>supra</u> § I, Dr. Jackson's exceptional work as an oncologist should weigh strongly against a term of incarceration.  Dr. Jackson saved lives.  Dr. Jackson eased the pain of patients and the trauma of families.  Dr. Jackson build institutional programs that remain robust to this day.  As made clear in the letters of former patients, family members, and colleagues, his passion and commitment were extraordinary.

Dr. Jackson's sixteen-year service in the United States Armed Forces also cuts against jail time.  Dr. Jackson served as an Army doctor far beyond his required commitment.  He

---

[82] Details related to Dr. Jackson's background and personal characteristics are set forth <u>supra</u> in Section I.  To avoid repetition, they are not repeated again here.

attended to numerous servicemen and women, and their families.  This loyalty to country should be credited to Dr. Jackson.

Dr. Jackson's dedicated community service efforts also should be considered as mitigation in this Court's sentencing determination.  His American Cancer Society activism and board membership, his fundraising efforts, his church involvement, and his charitable efforts provide insight into Dr. Jackson's character -- factors that weigh against a term of imprisonment.

### 5.   The Nature and Circumstances of the Offense Support A Departure Below the Guidelines Range

The nature and circumstances of Dr. Jackson's conduct also militate strongly in favor of leniency, and specifically, no jail time.  As set forth in detail above, Dr. Jackson sought to combat crime on the e-gold platform.  Admittedly, he did not do enough.  Importantly, he has accepted full responsibility for these actions, has willingly undertaken enormous and expensive compliance obligations as part of his guilty plea, and is fully committed to operating a criminal-free online business.

Dr. Jackson's acceptance of responsibility is not at issue here.  He repeatedly has acknowledged his role in the conduct.  As the Court no doubt will remember from the lengthy plea proceedings that lasted the better part of a day, it was Dr. Jackson who stood up three times during the guilty plea proceedings.  He raised his right hand and took responsibility for his own actions, those of the e-gold, and those of G&SR.  He did not have to do so, though.  As this Court recognized at the time, Bernie Grimm, Esq., and Aron Raskas, Esq., on behalf of their respective clients, could have entered the pleas.  But that was not acceptable to Dr. Jackson.  He wanted to send a strong signal to this Court that he was owning up to his conduct.  For better or worse, he founded e-gold.  Unfortunately, his efforts at fighting crime did not go far enough.  It

was important to him that he stand up and take responsibility in front of this Court.  And he did so.

Moreover, his acceptance of responsibility did not end at the courthouse steps that day. The day he pleaded guilty, and took full responsibility for his own actions and the actions of his companies, Dr. Jackson drafted and posted on the e-gold website a clear acceptance of responsibility for e-gold's failures in fighting online crime.  Again, he did not have to do this. But he believed it was important to accept responsibility in a public forum, outside of the courtroom.  In this notice, Dr. Jackson discussed the failures that led to e-gold being abused by criminals, acknowledged the need for more regulations and identified changes that were being implemented to ensure that this never happened again.[83]

Additionally, Dr. Jackson has worked closely with the government since the time of the plea to create compliance guidelines for both companies.  In some ways, this effort at enhanced compliance is a recognition that prior compliance could have been better.  Moreover, throughout the entire process of this investigation, prosecution, pre-trial proceedings, and plea, Dr. Jackson has continuously shown respect and candor with this Court and with Pretrial services.  As is noted in the Presentence Report, Dr. Jackson has been compliant with the conditions of his release.  If the old adage "actions speak louder than words" has any meaning, Dr. Jackson's conduct before, during and after the guilty plea demonstrate a clear acceptance of responsibility.

While accepting full responsibility, it is important to note that Dr. Jackson never engaged in the kind of conduct undertaken by the online criminals.  He never engaged in any kind of credit card fraud or identity theft.  Moreover, as noted in multiple places above, Dr. Jackson took great offense at child pornography and fought it at every opportunity.  At issue, though, is his

---

[83] See Exhibit 23 (July 21, 2008 post by Dr. Jackson "A New Beginning").

role in the laundering of proceeds. His guilty plea to this offense, though, does not place him in the heartland of traditional money laundering operations.

He did not undertake the business to wash criminal funds. He did not approve of or support the underlying criminal activity. In virtually all cases, he was not even aware that the funds involved in transactions were dirty. He even worked with law enforcement to ferret out this conduct. However, on behalf of e-gold, Dr. Jackson's compliance efforts were not sufficient; criminals still used the system. In this manner, although culpable (which he does not dispute), it pales in comparison to the vast majority of other money laundering cases.

Additionally, as noted above, the agreed-upon Guidelines Range further demonstrates that the nature and circumstances of the laundering are of a different kind and nature of other laundering enterprises. The government held Dr. Jackson personally responsible for approximately $40,000 in laundered funds. For a business that had been in operation for almost eight years up at the time of the indictment, and had processed over five billion dollars worth of transactions, approximately $40,000 is truly miniscule. In fact, it amounts to less than one thousandth of one percent of the business. When viewed in this light, the nature and circumstances of Dr. Jackson's laundering offense suggest lenient treatment at sentencing.

Several other factors, described in detail below, also weigh against jail time. Dr. Jackson made repeated efforts to get needed help from law enforcement to determine the best way to handle criminals using the e-gold platform. Moreover, Dr. Jackson's vision was never to profit from crimes committed by others.

       **a.**       **<u>Dr. Jackson's Repeated Yet Unsuccessful Requests For Guidance From Law Enforcement Weigh Against Any Jail Sentence</u>**

As e-gold developed, Dr. Jackson continued to recognize that the company stood to benefit from the guidance of law enforcement officers, given the nuances of this international

online business.  To this end, Dr. Jackson repeatedly sought out advice, help, and guidance from

the United States Secret Service, the Securities and Exchange Commission, the United States

Postal Inspector Service, the Federal Bureau of Investigation, the Internal Revenue Service, the

Federal Reserve, and the United States Treasury.  Put simply, Dr. Jackson was no fool and knew

experts at these agencies should be able to help him.  Dr. Jackson did not hide from these

regulators; rather, he sought them out.  In virtually every instance where Dr. Jackson found

transactions to be suspicious or user information to not be verifiable, he asked for law

enforcement help.

    A few of the instances other than those provided above include:

- An October 21, 2003 e-mail to H. Black with the United States Department of Justice asking for help, "I had called you to ask if you could re-energize the case that e-gold Ltd. and Gold & Silver Reserve, Inc. submitted to you a number of months age.  The case did not seem to go anywhere at that time because of other priorities at your office and at the FBI. . . .  As I mentioned, this case involves a significant sum in the aggregate . . . I am somewhat at a loss as to why the FBI and the US DOJ has not pursued this matter yet."[84]

- A September 25, 2006 e-mail from D. Jackson to Superintendent Saka-San of Japan's Cyber Crime Task Force where Dr. Jackson provides significant identifying information including e-mail addresses and IP addresses of Japanese purchasers of child pornography and notes that they have made significant progress in suppressing the abuse of e-gold by criminals who would profit from exploiting children.[85]

- A September 11, 2006 e-mail from D. Jackson to Col Fry, the Coordinator of Operations and Intelligence of the Australian High Tech Crimes Center identifying a purchaser of child pornographer in Melbourne and providing IP addresses, physical address, full legal name, and phone number and asking for assistance.[86]

---

[84] Exhibit 67 (Oct. 21 and 22, 2003 e-mails from B. Downey on behalf of e-gold and G&SR asking DOJ for help).

[85] See Exhibit 68 (Sep. 25, 2006 e-mail from D. Jackson to Superintendent Saka-San of Japan's Cyber -Crime task force).

[86] See Exhibit 69 (Sep. 11, 2006 e-mail from D. Jackson to Col Fry of Australian High-Tech Crime Unit).

Thus, Dr. Jackson's efforts to contact law enforcement, alert them of potential fraud and seek guidance demonstrate that the nature and circumstances of the offenses do not cry out for a sentence of incarceration, but rather support a non-jail sentence.

**b.**   **The E-gold Vision In No Way Contemplated Criminality, and as such, Weighs In Favor of a Non-Jail Sentence**

When Dr. Jackson set out to build e-gold, assisting criminal elements was the furthest thing from his mind. From Dr. Jackson's perspective, he was seeking to build an enduring monetary institution free from the embedded contradictions that per his analysis had undermined all previous monetary regimes from the time of the pharaohs. Sadly, he failed to comprehensively monitor the users of the system and did not comply with the licensing requirements.

Dr. Jackson's original intentions are important, though. There is not a single shred of evidence (in or out of the record) to suggest that Dr. Jackson embarked on this crusade in order to assist wrongdoers. At multiple turns, he sought legal advice from attorneys referred to the company and guidance from law enforcement. He cooperated repeatedly with domestic and international law enforcement agencies. He directed attorneys hired by the companies to comply fully and immediately with subpoena requests. Indeed, he opened up his database on numerous occasions to government agents. He operated openly. He spoke at conferences alongside law enforcement agents. He aggressively partnered with organizations which aimed at stamping out child pornography and other online crime. These actions certainly are not the indicia of someone interested in fostering criminal activity. Fraudsters operate in the shadows and avoid the spotlight. Dr. Jackson did the complete opposite: he opened his business up to scrutiny.

Interestingly, e-gold in many ways is like Hotmail.com, PayPal, Craigslist or eBay. They all were set up and remain legitimate online businesses fulfilling important functions. Moreover,

like e-gold, each of them has been victimized by online predators.  It cannot be disputed that identity thieves, carders, and child pornographers historically have used each of these platforms to make money.  Likewise, given the profit models -- whether it be through advertising, click-through business, transaction fees or sign-up fees -- each of these businesses have profited from the activities of online predators and criminals.  For reasons known only to the government, the prosecution in this subject area elected to focus on Dr. Jackson and e-gold.[87]  As a result of the government's attention, e-gold is now in a better position to move into a new area, in full compliance with the law, and with excellent and motivated investigators poised ready to pursue any one who attempts to use the system for criminal purposes in the future.

### C.   Dr. Jackson Will Best Serve Law Enforcement If Not Incarcerated

A jail term for Dr. Jackson will directly hinder law enforcement's efforts to fight online crime, including child pornography and identity theft.  In all of the same ways described above, Dr. Jackson continues to work regularly with law enforcement in ferreting out criminals using e-gold, or, as is currently the more common pattern, who may have left footprints in e-gold years ago.  Although he received no "5K" promises from the prosecutors, Dr. Jackson remains fully cooperative.[88]  On a daily basis, he accesses the database, provides information on suspicious activity, shuts down and blocks user accounts and pushes an agenda aimed at stopping crime.

This assistance is important to law enforcement.  Even a cursory look at the myriad of attached e-mails from law enforcement demonstrates that his help is vital in the fight against

---

[87] The government retains the discretion to prosecute who it wants, when it wants.  Dr. Jackson does not question or dispute that fundamental principle.  But the kinds of cases the government elects *not* to prosecute certainly can be taken into account in fashioning the appropriate sentence.  It is interesting that the federal government here in D.C. allows open criminality to run rampant on a platform like Craigslist.  Even a cursory glance at that site demonstrates the existence of prostitution.  See http://washingtondc.craigslist.org/search/ers/?query=w4m; http://washingtondc.craigslist.org/ths/.  Likewise, personal ads in local magazines and newspapers clearly provide a forum for similar illegal transactions.

[88] Dr. Jackson may be eligible for a sentencing reduction pursuant to Fed. R. Crim. P. 35 is, as expected, his cooperation continues beyond sentencing.

online crime.  If he goes to jail, he will be unable to assist.  While they may try, others at the

company do not come close to Dr. Jackson's abilities to mine the database and provide

information to law enforcement.  While Dr. Jackson has committed to providing this database to

law enforcement, it is his investigative work and his queries and searches that have provided the

information necessary to identify and locate the users based on their (often changing) IP

addresses and other verifiable information.  It is fair to say that a jail sentence will demonstrably

hinder law enforcement efforts.  The benefits of a non-jail sentence thus outweigh any benefits

from a sentence of incarceration.

Similarly, incarcerating Dr. Jackson will thwart the government's efforts to ensure e-

gold's compliance.  The plea agreement reached in this case provides for the companies to

adhere to strict compliance procedures and guidelines.  Dr. Jackson is the person best situated to

implement the complex and evolutionary tasks of a robust and compliant Anti-Money

Laundering Program.  He currently spends most of each waking day on this effort.  Putting him

in jail will make compliance extremely difficult.  If Dr. Jackson were incarcerated for any

amount of time, e-gold and G&SR would be without their strongest asset.

### D.      There Is No risk of Recidivism, Thus Supporting a Non-Jail Sentence

Boiled down, Dr. Jackson's crimes are simple:  he failed to register his companies and he

did not do enough to ensure that online criminals were blocked from e-gold, while at the same

time allowing e-gold to make money from that criminal conduct.  These crimes, however, bring

with them no chance at all of recidivism.  Not only has Dr. Jackson has acknowledged his

mistakes and the mistakes made by his companies for which he was responsible, Dr. Jackson has

affirmatively put into place steps to ensure there is no repeat, even unintentional, of the conduct.

Indeed, these compliance steps will be closely monitored by the government.  Moreover, Dr.

Jackson has taken all appropriate steps to register the companies.

Dr. Jackson has embraced a rigorous compliance program for e-gold.  Dr. Jackson is leading the efforts of both e-gold and G&SR to adhere strictly to the compliance effort -- beginning with submitting registrations forms to register the companies as Money Services Businesses.  Additionally, applications have been submitted in each state that requires a license for a business engaged in money transmitting.

The companies have retained KPMG as a consultant and under its guidance, an ambitious BSA/AML Compliance Program Enhancement Plan has been developed by both companies which will drive multiple generations of software and protocol development.  The very day that he signed the plea agreement, Dr. Jackson prominently posted on the e-gold website publicly noting, among other things, that the companies sought to "make something clear that should have been made more emphatically clear long ago.  Use of the e-gold system for criminal activity will not be tolerated."[89]  Dr. Jackson has added provisions to the e-gold user agreement, spent countless hours establishing procedures for verifying customer identification, ensuring that all accounts will be compliant with 31 U.S.C. § 5318(a) and 31 C.F.R. § 103.125, and ensuring that all new procedures will be in compliance with OFAC regulation.  Perhaps most significantly, Dr. Jackson has, with the help of KPMG, been working to provide ongoing employee training so that all employees will be educated on AML issues.

Importantly, Dr. Jackson has attended the International Money Transmitters Conference in Miami, organized by the National Money Transmitters Association.  He also attended the Digital Phishnet conference in San Diego, which is a law enforcement conference organized by the National Cyber-Forensics Training Alliance, an alliance comprised of experts from industry, academia, and government focused on identifying the most significant threats on the Internet, and devising solutions for effectively detecting and combating those threats.  Dr. Jackson expects

---

[89] Exhibit 23 (July 21, 2008 Post by Dr. Jackson "A New Beginning").

to continue educating himself further in these areas and developing contacts with law enforcement officials to expand the effort to protect the companies and their products from criminal abuse.

Additionally, assessing Dr. Jackson's life in its entirety demonstrates that there is no risk of recidivism.  Studies have demonstrated that the vast majority of white collar offenders, like Dr. Jackson, pose little risk of recidivism.  See e.g., Peter J. Henning, Prior Good Works in the Age of Reasonableness, 20 Fed Sent'g Rep. 87 (2008); Ellen S. Podger, Throwing Away The Key, 116 Yale L. J. Pocket Part 279 (2007).  Moreover, Dr. Jackson is a first-time offender, which strongly suggests that he does not have a great risk of recidivism.  The U.S. Sentencing Commission analysis, published in 2004, acknowledges that defendants who are in Criminal History Category I, like Dr. Jackson, have the lowest rate of recidivism of all offenders.  See U.S.S.C., Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 6 (2004).  The Commission's finding that possible sentence reductions for "first offenders' are supported by the recidivism data and would recognize their lower offending rates." Id. at 15.  This is another factor in this case that supports leniency and a departure from the guidelines range.

The Commission's analysis went on to consider other factors that may have an impact on a criminal defendant's likelihood of re-offending.  When the Court considers Dr. Jackson's age, (the Commission explains that "[r]ecidivism rates decline consistently as age increases" Id. at 16.); his long history of continuous employment, his educational attainment (graduating from a top medical school and completing the intensive requirements to become a radiation oncologist), and his marital status, Dr. Jackson falls within the category of offenders least likely to recidivate. The Commission has acknowledged that employment status, educational attainment, and marital status each have the potential to affect recidivism rates and in each of those categories.  Id. at 12.

59

Dr. Jackson falls into the lowest category that exists and makes the statistical likelihood of recidivism for Dr. Jackson less than one percent.

It is also worth noting that Congress recently expressed a preference for offenders like Dr. Jackson to reduce the amount of time spent in prison. The Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008) sent a strong signal that community confinement and home detention are reasonable and viable sentencing options for white-collar offenders, and that age, likelihood of recidivism, rehabilitation, and the risk of community harm are valid sentencing considerations. The legislative history of the Act made clear that given the overwhelming financial burden placed upon the federal government by prison overcrowding, non-incarceration sentences should be carefully considered.[90] Given Dr. Jackson's age, the minimal likelihood of recidivism, the virtually nonexistent risk of community harm, the overburdened federal prison population, and the direction suggested by The Second Chance Act, a non-incarceration sentence is warranted here.

### E.      A sentence of incarceration will destroy his family

Placing Dr. Jackson in jail will shatter his family and devastate his two adopted children. Incarceration, in many ways, will punish them far more than it will punish Dr. Jackson. His family will suffer the most. As John Martin, former U.S. Attorney and United States District Judge for the Southern District of New York publicly stated:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is completely at odds with the

---

[90] "The Federal prison population has increased more than seven-fold over the past 20 years" and "expenditures on corrections alone increased from $9 billion in 1982 to more than $50 billion today." H.R. Rep. No. 110-140, pt II, at 2 (2007). As Rep Sheila Jackson-Lee -- one of the Act's original co-sponsors -- explained, "Congress sought through The Second Chance Act to reduce "considerable government expenditures on warehousing prisoners." 153 Cong. Rec. H13564, 13580 (daily ed., Nov. 13, 2007).

> sentencing philosophy that has been the hallmark of the American system of justice.

John S. Martin, Jr., <u>Let Judges Do Their Job</u>, N.Y. Times, at A31 (June 24, 2003) (2003 WLNR 5657759).  Dr. Jackson's family is a stark example of Judge Martin's point.  Katrina Jackson will become a single mother with $130,000 of credit card debt and virtually no sources of income. Incarceration, especially if in conjunction with the failure of the companies -- an outcome made much more likely by Dr. Jackson's incarceration -- would result in an absolute certainty of bankruptcy for his family.  The two boys will be further emotionally and financially harmed from this case.[91]

Dr. Jackson's boys, now 17 and 12, are handling the current situation as well as can be expected.  Both boys were present at the house during the initial 2005 raid by the Secret Service. The trauma from that day will stay with them forever.  The younger of the two boys, Sam, has always been outgoing and eager to be outside playing with friends.  With the current situation, Mrs. Jackson described her younger son as having "become insecure" and "having trouble making friends."[92]  There is no doubt in her mind that the cause of this change has been the stress placed on her husband and the circumstances surrounding the investigation and prosecution.

In his own letter to this Court, Sam himself explained that he feels "scared and sad most of the time" and that he wishes "things could be like they used to be."  Sam misses Dr. Jackson playing soccer and baseball with him after school and especially "making our special Jackson popcorn together and playing monopoly."[93]  Sam wrote to this Court, "Please don't send my dad

---

[91] Unfortunately, the government's investigation and prosecution of Dr. Jackson has placed significant stress on Dr. Jackson and his family.  His wife Katrina and he continue to work on their marriage, aiming to push beyond this dark period.  Dr. Jackson and his wife both believe that any period of incarceration, sadly, will significantly hinder these rehabilitative efforts.
[92] Exhibit 21.
[93] Exhibit 70 (Letter from S. Jackson).

to jail.  I don't believe he deserves this.  My family needs him.  He has always taken care of us and protected us.  I can't stand to think of Dad never being with us."[94]

The older of the two boys also has understandable anxiety about the current situation and a fear of losing his father.  Mrs. Jackson noted that Ben's "school performance is not as good as it once was."[95]

Mrs. Jackson is also terrified of the effect a term of prison will have on the boys.  In her letter to the Court, Mrs. Jackson explained the impact on the family if Dr. Jackson were to go to prison:

> Putting Doug in jail for any length of time would be truly catastrophic for our family.  We would lose even the small income he provides.  I would no longer be able to pay the rent or most of our bills.  My income would pay only a tiny portion of our expenses . . . .  In all likelihood, we could not afford rent and would be forced to live with family.  Also, sending Doug away would be crushing to our boys.  They are trying to recover after all that has happened to them already and this would be an enormous set-back for both of them.  Finally, the investigation and all that has come with it has put our marriage under great stress.  Even though we have 30 core years behind us, this has been a true upheaval.  Doug and I continue to work at getting through this difficult time.  Sending Doug to prison would hurt our efforts at moving forward with our lives.[96]

The financial toll that this investigation, prosecution, and guilty plea have taken on the family already is significant and cannot be understated.  The family has watched as their personal finances have deteriorated to the point where they are paying monthly bills using lines of credit.  They were forced to sell their home and have, over the past four years, moved three times.  While they are a strong family, these moves have taken a toll on Mrs. Jackson and most importantly, the boys.  Mrs. Jackson explained to the Court that although they have dramatically cut their expenses, the family's total income decreases each year.  Mrs. Jackson now has a part time job but it pays only a small portion of their expenses and while she is willing to work, she

---

[94] Id.
[95] Exhibit 21.
[96] Id.

notes that "finding a better position in the current job market with [her] limited work experience is a huge challenge."[97]

Courts have long recognized the significant impact that incarceration has on the families of the defendants and acknowledged that there are circumstances where the loss of caretaking or financial support to a family may warrant a departure.  See e.g., United States v. Dyce, 91 F.3d 1462, 1473 (D.C.Cir. 1996) (nothing that the impact of imprisonment on a defendant's family is profound, imposing financial and emotional hardship) (Judge Wald Dissenting); United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999) (departure warranted to minimize the impact on the defendant's children in case where defendant financially supported wife and children and worked long hours); United States v. Sclamo, 993 F.2d 970 (1st Cir. 1993) (departure warranted based on the defendants significant relationship with and responsibilities to lover's child).

While family ties are not ordinarily relevant in determining whether a departure may be warranted, under U.S.S.G. § 5H1.6, Courts have often found exceptional circumstances in situations quite similar to Dr. Jackson's.  Here, Dr. Jackson is the primary financial provider for his wife and their two children.  Their two sons are at that age where they need their father more than ever -- teenagers.  Courts have repeatedly held that situations similar to this one may be such to warrant a departure for exceptional family circumstances.  For example, in United States v. Greene, the Court provided for a non-custodial sentence in a case where the defendant was the sole provider of financial support for his three adopted children.  The Court in that case found that because of the defendant's responsibilities to his children, combined with the lack of any prior criminal history points, a non-custodial sentence was sufficient to serve the aims of deterrence and retribution.  249 F.Supp. 2d 262 (S.D.N.Y. 2003).  Another Court, in United States v. Galante, upheld a departure for exceptional family circumstances where, like here, the

---

[97] Id.

defendant was the primary earner, and where, like here, the defendant's wife and two children were dependent on his income, and where, like the instant case, the family was at risk of losing their housing without his income.  111 F.3d 1029, 1031 (2d Cir. 1997).

For years, Katrina Jackson focused her time, talent, and energy on raising their children. Given the financial difficulties that have significantly befallen Dr. Jackson and e-gold since the government initiated its investigation, Mrs. Jackson has taken a more active role in working outside the home.  Indeed, Mrs. Jackson has started an education process to become a Certified Fraud Examiner to gain expertise in fraud prevention, detection, and deterrence.  While the stress of the current circumstances facing the Jackson family have been challenging, the family hopes that they will be able to move into the future together.

### F.       The Appropriate Sentence for Dr. Jackson Is Probation with No Term of Incarceration

Dr. Jackson committed two crimes.  He has pleaded guilty and accepted full responsibility for his actions.  Moreover, he has taken responsibility for the actions of e-gold and G&SR.  When he wakes up each day, he is not proud of this past.  He knows he will feel marked and branded for the rest of his life.  He has shamed his family, and himself.

A jail sentence, however, is not merited by the totality of facts or existing case law.  It will not deter additional conduct or provide victims with a sense of retribution.  Rather, it will destroy his family, currently under great financial and personal strain due to the circumstances. Moreover, it will dramatically affect law enforcement's efforts to mine the e-gold databases to combat online crime.  Additionally, it will ignore the vast cooperation Dr. Jackson has provided over the past decade to law enforcement.

In contrast, a sentence of probation will fully take into account all of the section 3553 factors.  Dr. Jackson will be able to assist law enforcement on a daily basis.  He will be able to devote time and energy to restructuring e-gold as a financial institution fully compliant with U.S.

law and regulations.  He will be able to earn a living that will support his family and he will be

able to rebuild the strained bonds with his children, and his wife. [98]

## CONCLUSION

For the reasons set forth herein, we respectfully request that the Court impose a sentence

of probation, with no jail time.

Respectfully Submitted,

/s/  Joshua G. Berman_____
Joshua G. Berman (D.C. Bar # 489751)
Machalagh Carr (D.C. Bar # 501275)
Sonnenschein Nath & Rosenthal LLP
1301 K St N.W. Suite 600E
Washington, D.C. 20005
Telephone: (202) 408-5208
Facsimile:  (202) 408-6399
*Attorneys for Defendant Douglas L. Jackson*

---

[98] The government and Dr. Jackson agree that no restitution is applicable in this case.  Based on the guidelines of level 13, the defendant is subject to the imposition of a fine in the range $3,000 to $500,000.  Other than the special assessment of $100 that is mandatory as to each Count, Dr. Jackson agrees with the government that no other restitution is applicable and Dr. Jackson agrees with the Presentence Investigation Report that he does not have the ability to pay a fine.